**IMCO CONTAINER CO. OF HARRISON-BURG, a Division of Consolidated Thermo-Plastics Company, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 9627.

United States Court of Appeals Fourth Circuit.

Argued March 3, 1965.

Decided May 7, 1965.

Harry L. Browne, Kansas City, Mo. (Herschel Phillips and Philip W. Polgreen, Los Angeles, Cal., and Spencer, Fane, Britt & Browne, Kansas City, Mo., on brief), for petitioner.

Anthony J. Obadal, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Nancy M. Sherman, Atty., National Labor Relations Board, on brief), for respondent.

Before HAYNSWORTH, Chief Judge, BRYAN, Circuit Judge, and BUTZNER, District Judge.

ALBERT V. BRYAN, Circuit Judge:

The National Labor Relations Board found Imco Container Company of Harrisonburg, Virginia, had engaged in practices declared unfair by the National Labor Relations Act, as amended.[1] 148

NLRB No. 32, August 14, 1964. Imco petitions to set aside, the Board to enforce, the cease and desist order entered on the finding. We hold with Imco.

Conduct of Imco affronted the Act, it is said, because its effect was "to interfere with, restrain, or coerce employees", in violation of § 8(a) (1),[2] "in the exercise of the rights guaranteed in section 7", that is "the right to self-organization, to form, join, or assist labor organizations".[3] Imco's misdoings are these:

(a) Announcement and award of a wage increase with the object of persuading its employees to reject the union;

(b) Questioning of employees about their union activity; and

(c) Threatening employees with loss of economic advantages, including closure of the plant, if they brought in a union.

While the complaint and the evidence of the General Counsel make many charges and adduce much testimony in respect to interrogations and threats, the Board eliminated many of these accusations and confined its order to a few transgressions. Only the actual findings need be discussed by us.

Imco candidly opposed the entry of a union. Equally insistent was Textile Workers Union of America, AFL-CIO, in its advocacy of unionization. In February 1962 this union lost an election for representation of Imco's employees. It was determined to try again, and the present controversies arose in the resumed campaign. Admittedly, the employer and the union each resorted to strenuous measures to carry its side. The issues are the legality and propriety of their respective pre-election efforts.

Just before the day of the election (April 26, 1963) which had been called on the request of the union and with the consent of the employer, Textile Workers filed a charge, embodied in the complaint now before us, accusing Imco of improper deportment in anticipation of the elec-

---

1. 61 Stat. 136, 29 U.S.C. § 141 et seq.

2. 29 U.S.C. § 158(a) (1).

3. 29 U.S.C. § 157.

tion and of refusing to bargain with the union. §§ 8(a) (1) and (5) of the Act. Because of the complaint the election was cancelled. The refusal-to-bargain accusation was dismissed by the Examiner, with affirmance by the Board, upon the ground that the union was not the representative of the employees. Behind this ruling was proof of the forgery of a sufficient number of union representation cards to dissolve the majority claimed by it. However, this decision is not on review here and our canvass covers only the proceedings before the Board on the remainder of the complaint.

The Examiner and the Board found the facts we now recount. In the fall of 1962, following the union defeat in February, an organizer for the union returned to Harrisonburg to press the union movement again, even though under the Act another election could not be held within a year of the prior one. § 9(c) (3).[4] Having participated in the other election, his presence and purpose were known and understood by Imco.

On November 21, 1962, Imco's plant manager, G. W. Butts, informed the employees of projected plans and programs by the company, including a raise effective the first pay period in March 1963. The promised supplement was 5¢ an hour. Butts says he then explained that Imco had been prevented from giving an increase at the desired time on two previous occasions by reason of the currency of union campaigns. The only reason for notifying the employees so far in advance of the effective date, he stated, was to assure them of a March raise. Any appearance of it as a bid or bait for ballots is denied by the company.

In the circumstances, the Board thought the announcement conclusively took the shape of the deprecated inducement. It believed that the beneficence evinced a "purpose of impinging upon the [employees'] freedom of choice for or against unionization". N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964). In our judgment there is not substantial evidence, when the record is considered as a whole, to warrant this finding.

When news of the benefit was released, unlike the situation in Exchange Parts Co., supra, 375 U.S. 405, 84 S.Ct. 457 (1964), no election had been sought. Indeed, none could be ordered for at least four months thereafter. Against the unfavorable implication deduced by the Board, the reasons advanced by the employer for its actions are not thin or frivolous, but sound and just. The employer did not know at the time of its declaration just when, if at all, another election would be scheduled. The employees knew that improvements in pay had usually come early in the year. Furthermore, the announcement morally— and practically irrevocably—bound the employer to its fulfillment. Consequently, the employees could feel certain of the payment regardless of how they voted. Additionally, holding customary wage betterments in abeyance pending an election might seem to be hanging a favor or threat over the voters' heads.

■ On these premises, we think decision should follow the reasoning and determination of this court in National Labor Relations Board v. W. T. Grant Co., 208 F.2d 710, 712 (4 Cir. 1953). Facing facts more formidable for the Board's conclusion than exist presently, the court overruled a finding of an unfair labor practice in the augmenting of wages. Judge Soper's words for the court are so immediately pat and apt they cry for repetition:

"The gist of the case is the Board's finding that the increase in wages *during the campaign* was made to discourage union membership and amounted to an unfair labor practice. We do not think that the evidence taken as a whole supports this finding. The Board mentions but belittles the uncontradicted evidence that the increase was not

4. 29 U.S.C. § 159(c) (3).

considered or made until the manager of the store was informed by the manager of a rival Murphy store in the same block that he intended to raise the wage level in his store. Grant cannot be condemned for taking this fact into consideration and acting upon it promptly, especially as the evidence indicates that Grant prided itself on paying its employees as well as any store in Elkins. *Certainly it cannot be laid down as a governing rule that during a union campaign, management must deny to its employees increased advantages which in the absence of the campaign would be granted.* * * * But when all the facts in the pending case are carefully considered, it is seen that the Board's conclusion that the purpose and effect of the wage increase was unlawful and unfair is based only on an inference too tenuous to support its order." (Accent added.)

■ Likewise, no firm foundation is observable in the record for the findings of overbearing interrogation and serious threats of plant closure and loss of economic benefits. The first is taken from an address by Ralph Hanson, a department supervisor. Shortly before the election, in a separate speech to three shifts of about thirty employees each, he is quoted as having said that "the company was opposed to [the employees] inviting a third party [the union]" and of asking each group "who invited them over here, who had made it their business to invite them".

Although these words are not denied by Hanson, it is quite obvious to us that his questions were rhetorical, impersonal, directed to an audience and not an individual inquiry. They were nothing more than oratorical flourishes, certainly not Inquisitional. It is the only interrogation cited to support the § 8(a)(1) infraction by the Board.

With regard to loss of economic benefits, objectionable statements are found to have been made by two supervisory agents, Marie Moubrey and Guy Shoemaker. The former—a leadlady—assertedly stated to Ruby McKenny, an employee, prior to the proposed election that the plant would be closed upon the advent of the union and that employees would then lose their profit-sharing and insurance programs. On the campaign issue of union advantages and disadvantages the employer authorized its supervisors to exhibit copies of pertinent clauses in Imco's contracts elsewhere. Moubrey's statement was in response to McKenny's inquiry about such a provision. McKenny described this incident:

"I read the paragraph she showed me, that she showed me in it, and as I understood it, it said the company could move machinery in and out. It could operate as they saw fit. They would permit us—they would promote us, according to our ability and efficiency, in our work, and I believe that is it, as I recall it."

When asked what this meant, the words attributed to Moubrey in reply were:

"It means exactly what it says. In fact the corn is just beginning to pop * * * the plant will close if we vote the union."

Guy Shoemaker—a leadman—reportedly also uttered threats of a plant closing. In the presence of employees Witherow and Breeden, he is accused of saying:

"Mr. Butts [plant manager] could shutdown the plant and could [or would] close the doors if the Union came in."

■ That there would be no closing of the plant or loss of economic benefits with or without a union was repeatedly assured the employees by a managerial representative, by Foreman Hanson and by Manager Butts. This was all the company could do to still any anxiety the remarks of Moubrey and Shoemaker may have caused the employees. Furthermore, while Moubrey and Shoemaker denied the assertions ascribed to them, these declarations, if made, were not in their frame and singleness so forceful as to override the company's disavowal.

Surely in their context they were not statutory offenses.

For these reasons we think the order of the Board is not supportable.

Enforcement denied.