**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**M & W MARINE WAYS, INC., Respondent.**

**No. 25921.**

United States Court of Appeals Fifth Circuit.

June 9, 1969.

---

Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Michael N. Sohn, Atty., NLRB, for petitioner.

Charles K. Reasonover, Deutsch, Kerrigan & Stiles, New Orleans, La., for respondent, Bernard Marcus, New Orleans, La., of counsel.

Before THORNBERRY and DYER, Circuit Judges, and FISHER, District Judge.

DYER, Circuit Judge:

This is a petition by the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended [1] to enforce its order issued against the Respondent.[2]

The Company had sixty-four employees and carried on a general shipyard business. In August, 1965, the Union [3] attempted to organize the Company's employees. During this time two supervisors, admittedly in violation of the Act, interrogated employees Mitchell, Odenwald, Stone and Jones and threatened Stone. On August 31, 1965, the Union filed unfair labor practice charges and a petition for an election. Thereafter a Stipulation for Certification upon Consent Election was entered into by the Union and the Company, the election to be held on November 10, 1965.

On September 2, 1965, after receipt of the Union's petition, the Company conferred with counsel as a result of which management personnel were given a list of "do's" and "don'ts" concerning how they should conduct themselves to avoid unfair labor practices.

On September 3, 1965, the plant manager spoke to all of the employees, assuring them that no one would get fired because of belonging to a union.[4] The

1. 29 U.S.C.A. § 151 et seq.

2. 165 N.L.R.B. No. 24, June 8, 1967.

3. The International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, AFL–CIO.

4. The plant manager's exegesis could hardly have been more fair:
   Now let me put you all at ease about one thing. Never have I fired anyone for union membership or union activity, never have I refused to hire anyone be-

Company permitted distribution of union literature during working time, and the union employees wore their union badges without restriction.

The Union lost the election by a vote of 40 to 14. Its objections were found to be without merit, but the Regional Director filed his own objection, based on the unfair labor practice charges which had been lodged by the Union. The Board upheld the trial examiner's 8 (a) (1) findings for the period prior to the filing of the petition for an election. The trial examiner also found that one 8(a) (1) violation had occurred between the date of filing of the petition and the election date, in a conversation between supervisor Frey and employee Jacobi, but that it was too insignificant to justify setting aside the election. The Board in a two to one decision reversed the trial examiner concerning the Frey-Jacobi conversation, and additionally concluded, contrary to the trial examiner, that an 8(a) (1) violation had also occurred, after the petition was filed, in a conversation between Frey and employee Bourgeois.

■ *In limine* we dispose of the pre-petition 8(a) (1) violations of the Act. The Company has not challenged the Board's findings with respect to these violations, and substantial evidence on the record as a whole supports the conclusion that the conduct complained of tended to interfere with the free exercise of the employees' Section 7 rights. N.L.R.B. v. Camco, Inc., 5 Cir. 1965, 340 F.2d 803; N.L.R.B. v. Schill Steel Prods., Inc., 5 Cir. 1965, 340 F.2d 568.

Whether the post-petition conversations between supervisor Frey and employees Jacobi and Bourgeois constitute 8(a) (1) violations and, if so, whether they are insignificant or should be enforced is the crucial issue before us.

### The Frey-Jacobi Conversation

Frey and Jacobi were good friends. On various occasions they ate and relaxed together. About two weeks before the election, in the evening, they met (with no one else present) and started talking about the topic of the day, the Union. It appeared at that time that perhaps seventy percent of the men might vote for the Union. Frey said that a lot of things could take place to change that between that time and the time of the election. He also said that the days of some of the men would be numbered if the Union got in, mentioning Dufrene, Bourgeois and Odenwald.

Jacobi characterized his talk with Frey as general conversation, not a discussion. He gave it so little thought that he couldn't remember who started the conversation, or who mentioned the names, saying that it was possible that he initiated the talk—that he never made a point to notice who said what. "I hadn't paid it any mind one way or the other. Nobody made an issue of the organizing, like that." Further emphasizing that it was just general conversation and "no discussion of any kind," Jacobi did not mention the conversations to anyone else.

The Board majority found Frey's one conversation with his friend to be a threat, coercively made in the context of an election campaign in which the Company had openly opposed the Union. The Board concedes that the pre-petition conduct of the Company cannot be used to set aside an election, but nevertheless considers it in evaluating the weight to

---

cause I knew they belonged to the union —all for two reasons: 1—It is not a fair way to treat a man; 2—It is against the law.

The labor board has told me and the union has told me that some of you have signed union cards and that we will probably have an election.

Please be assured that I will not close down the yard because we may have an election, nor will I close down the yard if we have a picket line, nor will I close down the yard if the union wins the election.

\* \* \* \* \*

The law regarding labor relations is written to protect both the union and the employer. We will work within the law and urge that all of you, regardless of how you feel about the union, also work within the law.

be afforded an allegedly isolated post-petition unfair labor practice, and then, referring to the Company's continuous anti-union campaign through the critical period, refuses to assume (as it says the trial examiner did) that the threat made was not communicated to other employees.

■ There is, of course, nothing wrong with "openly opposing the union" or "conducting an anti-union campaign" so long as it does not impinge upon the rights of the employees concerning their union activities. Schwob Mfg. Co. v. N. L. R. B., 5 Cir. 1962, 297 F.2d 864. Except for this Jacobi incident and one regarding Bourgeois (which we discuss *infra*) there is no suggestion in the record of any post-petition company conduct in violation of the Act—on the contrary, the actions of its supervisory personnel were exemplary. The tone was properly set in the speech made by the general manager, soon after the Union's petition was filed, that the plant would not close if the Union won, and that no employees had ever been or would be discharged because of union activities. This was followed by a written list of "do's" and "don'ts" to insure fairness to all concerned. Furthermore, the Board was in error in stating that the trial examiner *assumed* that the conversation between Frey and Jacobi would not be communicated to other employees. Jacobi unequivocally stated that he never mentioned these conversations to anyone else.

In the totality of the circumstances, the credited testimony of Jacobi stands for just what he said, not what the Board says he said. It was a friendly conversation—not a discussion—of a timely topic, in which Frey was not seeking information on which to take action against individual employees. It was apparently a chance casual meeting, in the evening, not in an atmosphere of unnatural formality. It was not an interrogation. There was nothing systematic or intensive about it. In the presence of these facts, N. L. R. B. v. Camco, Inc., *supra,* relied on by the Board, is inapposite. Nor are we persuaded by the

Board, that N. L. R. B. v. J. H. Rutter-Rex Mfg. Co., 5 Cir. 1956, 229 F.2d 816, is helpful. That case turned on an inflammatory speech by the president of the company to its employees—just the opposite of the uncontradicted evidence *sub judice*.

■ We think the Board's characterization of the conversation between Frey and Jacobi as threatening and coercive is unrealistic and unsupported by the evidence. "The meeting of the two men was unplanned, informal, social [and friendly] in nature and actually uncoercive in effect." Pioneer Drilling Co., Inc. v. N. L. R. B., 10 Cir. 1968, 391 F.2d 961, 964. Even if we accepted the Board's finding that the conversation constituted an unfair labor practice in violation of 8(a) (1) of the Act, it was such an isolated and inconsequential one that a remedial order would not be warranted. Hill-Behan Lumber Co. v. N. L. R. B., 5 Cir. 1968, 396 F.2d 807.

### Frey-Bourgeois Conversation

Bourgeois was a union organizer who wore his badge almost every day. A few days before the election, after Bourgeois had quit for the day and was on his way home, Frey stopped him and "he asked me how I felt about the union. I told him it really didn't matter because I didn't know how long I was going to be there. And he also, at that time, asked me what about, was Jessie Martin involved with the union at Plastic Applicators at the time it closed down. I told him no, he was wrong, Jessie didn't have anything to do with it. It was the Teamsters' Union." Frey then said that "he never did have me figured to be much of a union man * * *." This was the only conversation Bourgeois had with Frey about the Union. Bourgeois testified that he did not regard this informal meeting and conversation as threatening or coercive.

The trial examiner found that Frey's inquiries did not violate Section 8(a) (1) of the Act. ·The Board reversed two to one. The majority concluded that considered in the context of the Company's

other unfair labor practices (presumably pre-petition), and its opposition to the Union, the incident was a violation of 8(a) (1).

There is no reason to iterate what the Company did to assure fairness after the Union's petition was filed. In its doctrinaire approach and in spite of the Company's good faith efforts, the Board's majority again overstresses pre-petition conduct of the Company and its opposition to the Union to bolster a decision that an isolated conversation between a supervisor and a union employee wearing a union button, about how the employee felt about the Union, is coercive. And this in the face of the employee's testimony that he did not consider what was said to be coercive.

Since there are no credibility choices involved, and no differing inferences that can be drawn, we conclude that this conduct and conversation are plainly not coercive. We find no substantial evidence in the record as a whole to support the Board's majority finding of an 8(a) (1) violation of the Act.

Enforced in part and denied in part.