**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BIG THREE INDUSTRIAL GAS & EQUIPMENT CO., Respondent.**

No. 77–2592.

United States Court of Appeals, Fifth Circuit.

Aug. 24, 1978.

Rehearing and Rehearing En Banc Denied Oct. 27, 1978.

---

Elliott Moore, Deputy Assoc. Gen. Counsel, Jesse Etelson, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, Michael S. Winer, Atty., N. L. R. B., Washington, D. C., for petitioner.

Charles R. Vickery, Jr., Houston, Tex., for respondent.

Before MORGAN and GEE, Circuit Judges, and KING, District Judge.*

LEWIS R. MORGAN, Circuit Judge:

This case comes before the court on petition by the National Labor Relations Board for enforcement of its decision and order in *Big Three Industrial & Gas Equipment Co.*, 230 NLRB No. 48 (1977). The Board found that the respondent Big Three violated § 8(a)(1) and § 8(a)(3) of the National Labor Relations Act. We must decide whether principles of law and substantial evidence support the determinations of the Board.

The controverted actions and issues arise from a summer, 1976 union drive among workers at the employer's Bayport plant in Pasadena, Texas. At this plant, Big Three manufactured oxygen, acetylene and nitrogen employing a workforce divided into two departments: maintenance workers and operations personnel. From the very beginning, union enthusiasm captured the maintenance department.[1] On July 1, 1976, a maintenance worker contacted a representative of Oil, Chemical and Atomic Workers, International Union, AFL–CIO to learn about union organizing. Authorization cards were obtained on July 14, and, by the end of the following day, twenty-seven employees, primarily in maintenance, had signed.

From others at the Bayport plant came a very different response. A daunting array of statements by Company supervisors alternately threatened union supporters while offering rewards for union opponents. This barrage commenced on June 29 as Supervisor Lindsay told a worker that a union was "a good way for all of us to get fired," and continued through August 20 when, in reference to the union, Supervisor Richardson told a worker, "You're going to get fired just as sure as the world goes around . . They're going to run everybody and bring in contract maintenance." In addition to threatening union supporters, Big Three op-

eratives dangled rewards before potential union opponents. On several occasions, supervisors indicated to employee Judd that his opposition to the union was well known and thoroughly appreciated. Workers in the operations department were apparently told that they would receive a 40-cent per hour wage increase in exchange for opposing the union.

Not surprisingly, the impetus behind the union drive began to fade. Although 33 of some 35 employees in the maintenance department eventually signed cards, little union zeal emanated from the operations unit. On August 2, with the union campaign at least temporarily stalled, two of its leaders approached the Company's General Manager, Sid Peters, to suggest the formation of a Company union or committee. Peters flatly rejected this proposal. Efforts to unionize were resumed but with less force than before and with few or no signatures added after August 2.

This diminution of unionist energies, however, did not engender a corresponding reduction in the strident opposition by the Company. On August 9, Supervisor Richardson told union leaders Hurt and Robb they would never get anywhere in the Company because of their activities, and he suggested they find jobs elsewhere. Richardson also disclosed the operation of an anti-union spy, Jim Bowlin, who it was later reported, had been promised a supervisory position in exchange for information about union supporters. On August 17, Richardson told an employee that Bowlin had given the supervisors the names of all employees who signed union cards.

On that same day, amid this continuing background of subtle coercion and outright threats, three employees working overtime ignored a Company directive that they eat dinner on the premises and not leave the plant without punching out or notifying a supervisor. Two of the workers, William Fairless and John Coryell, had signed union

---

* United States District Judge for the Southern District of Florida, sitting by designation.

1. The immediate catalyst for the union campaign was the employer's plan to lay off four people in maintenance due to overstaffing in that department.

cards. The third, Lee Judd, had not. Although Supervisor Richardson observed all three breaking the Company rule, he reported only Fairless and Coryell for disciplinary action. The next day Assistant Superintendent Borey, on Richardson's recommendation, suspended Fairless and Coryell for three days. Later that day, Richardson told the non-unionist rule breaker, Judd, not to leave the plant again without punching out, but added, "Don't worry about it, though. We're not after you."

While measures against union supporters pervade this case, they do not comprise the full story. Harm to the Company occurred as well, when, in July, lumber was jammed into a water pump causing damages of $1,200 to $1,300. Another act of apparent sabotage occurred in August as a boiler was discovered with its internal parts ripped out. This necessitated further repairs costing from $2,000 to $3,000. Then, on August 19 and 20 a series of threats were leveled against the Company and several of its supervisors.

The worst of it fell on Supervisor Richardson whose life was threatened by an anonymous telephone caller on the morning of August 19. Additionally, three shots were fired at his house, and sugar was placed in the gas tanks of his automobiles. Threatening phone calls were also made to the homes of other supervisory personnel and received by their wives causing great tension and anxiety. Further intensifying this wave of fear were several telephone bomb threats made to the plant on the evening of August 19 and on the next morning. As a result, the Company permitted the maintenance workforce to leave for the day on August 20. The operations workers, however, elected to continue working in order to prevent the inordinate expense and delay that any halt in production would have occasioned. Some investigation was made of these incidents by law enforcement officials and by the Company itself. However, no conclusive identifications of

the actual wrongdoers resulted.[2] A report of these events was delivered to a Company Vice President on August 23 and on the following day, Company officials met to consider action to solve the problems surrounding the maintenance department.

At this meeting, the plant manager recommended that the maintenance department be replaced by a return to contract maintenance, the means utilized until 1975. On the next day, August 25, Company officials adopted this proposal without attempting to implement alternatives. Later that evening, the Company announced that the maintenance work would be subcontracted and that all thirty-four workers in the maintenance department would be discharged.

From these and similar developments, the Board found that the Company perpetrated unfair labor practices during the period from the launching of the union drive through the mass discharge of the maintenance workforce. The assorted threats, interrogations, promises of benefits and creation of an impression of surveillance constituted violations of § 8(a)(1). The suspension of workers Fairless and Coryell was held to be anti-union discrimination within the proscription of § 8(a)(3). Finally, the mass discharge of all maintenance workers, which the Board found to be motivated by anti-union animus, was found to be a further violation of § 8(a)(3). After separately examining each alleged violation, we find the Board's determination to be supported by substantial evidence and consistent with the applicable law. We therefore enforce its decision and order.

*Section 8(a)(1): Threats, Promises and Supervisory Status*

Section 8(a)(1) of the National Labor Relations Act prohibits employers from interfering with, restraining, or coercing employees in the exercise of the rights to

---

**2.** Two telephone bomb threats had been recorded; however, no conclusive identification of the perpetrators resulted. Two witnesses reported the caller to be union advocate, Mike Robb. The assistant maintenance supervisor identified the voice as that of alleged Company spy, Jim Bowlin.

organize and bargain collectively. 29 U.S.C. § 158(a)(1). The Board identified more than a dozen acts of unlawful interference ranging from subtle intimation of advancement for workers who rejected the union, to crude threats of closing the plant should organizational efforts succeed. Additionally, the Board found that coercive interrogations had occurred in contravention of *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) and that the Company had created an impression of surveillance by the alleged spy, Jim Bowlin. These words and deeds could not fail to inhibit organizational efforts. Indeed, the Company does not contend that these acts were innocent, but rather argues that the supervisors responsible did not speak or act for the Company. The Administrative Law Judge found that because the operatives in question were supervisors within Section 2(11) of the Act, the Company is responsible for their conduct.

▉ We begin our assessment of the scope of Big Three's imputed liability by acknowledging the manifest supervisory status of Lindsay, Osborn, Richardson, and the others. These men were held to be supervisors by the Board and we owe deference to this resolution of a fact question and a matter of practical application by the Board to the infinite gradations of authority within a particular industry. *NLRB v. Swift & Co.*, 292 F.2d 561, 563 (1st Cir. 1961). Testing such findings against the standard of substantial evidence, we observe that Lindsay, Park, Richardson and Osborn were empowered to interview job applicants, grant time off, allocate overtime work, transfer employees and recommend wage increases. This authority unquestionably brought them within the criteria of Section 2(11).[3] Additionally, the men who the Company currently seeks to disavow were called supervisors, were regarded as such by both workers and higher management and even wore white hats to distinguish themselves from other employees. The case for supervisory status is compelling; it easily suffices as substantial evidence.

▉ However, the fact that perpetrators of anti-union interference are supervisors for Section 2(11) purposes may not conclusively establish an employer's liability. The definition contained in § 2(11) does not, by its terms, delineate parameters of managerial liability.[4] Instead, this provision describes persons who are supervisors for purposes of excluding them from various protections of the Act that other workers enjoy. *Beasley v. Food Fair of North Carolina*, 416 U.S. 653, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1974). Moreover, in *NLRB v. Link-Belt Co.*, 311 U.S. 584, 599, 61 S.Ct. 358, 366, 85 L.Ed. 368, 378–379 (1940), the Supreme Court said:

> If the words or deeds of the supervisory employees, taken in their setting, were reasonably likely to have restrained the employees' choice and if the employer may fairly be said to have been responsible for them, they are a proper basis for the conclusion that the employer did interfere.

Thus, even if perpetrators of anti-union conduct are § 2(11) supervisors, the specific

---

**3.** Section 2(11) of the Act defines a supervisor as:

> . . . any individual having the authority, in the interest of the employer, to hire, transfer, . . . assign, reward or discipline other employees, or responsibility to direct them . . . or effectively recommend such action, if in connection with the foregoing, the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). Courts have repeatedly emphasized that these criteria are enumerated disjunctively so that the possession of any single function will suffice. *E. g., NLRB v. Securi-*

ty *Guard Service, Inc.*, 384 F.2d 143, 146–147 (5th Cir. 1967).

**4.** The statutory definition of "employer" includes "any person acting as an agent of an employer, directly or indirectly" and does not use the term "supervisor." 29 U.S.C. § 152(2). Accordingly, the statutory test for imputing liability is based upon principles of agency to be applied expansively in accordance with the underlying policy of the Act. *See Furr's, Inc. v. NLRB*, 381 F.2d 562, 567 (10th Cir.) *cert. denied*, 389 U.S. 840, 88 S.Ct. 70, 19 L.Ed.2d 105 (1967).

conduct at issue must be cloaked with the employer's authorization. However, while supervisory acts are not conclusively imputed to the employer, lower court decisions subsequent to *Link-Belt Co.* frequently assume that when supervisors act, they act for the employer: "If they are supervisors, the Company is responsible for their conduct." *Amalgamated Clothing Workers v. NLRB*, 124 U.S.App.D.C. 365, 376, 365 F.2d 898, 909 (1966). *See also NLRB v. Kaiser Agr. Chem. Div. of Kaiser A&C Corp.*, 473 F.2d 374, 384 (5th Cir. 1973); *NLRB v. American Mfg. Co. of Texas*, 351 F.2d 74, 78 (5th Cir. 1965). The force of presumption is evinced by the methodology of these cases if not their express terms.[5]

■ Accordingly, we find in the present case that because the guilty actors are supervisors, Big Three is presumptively liable for their words and deeds. To dispel this presumption, various means are available. For example, a company's sufficient repudiation of supervisory misconduct may absolve it of liability for unfair labor practices. *E. g., Imco Container Co. v. NLRB*, 346 F.2d 178, 181 (4th Cir. 1965). In the case before us, though, Big Three does not say that it repudiated the anti-union warfare waged by its supervisors.[6] Rather, the Company relies on a second basis for over-

coming its presumed liability; Big Three disavows the alleged misconduct claiming that such acts were isolated, casual, innocuous and committed by low-level supervisors.

A recent case forgiving an employer for interference by low ranking supervisors is our decision in *Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245 (5th Cir. 1978). In that case, we found no § 8(a)(1) liability because:

> . . . these statements were made by low-echelon foremen and supervisors who were friends of the employees and knew them on a first-name basis, . . . the statements were made at the work stations or during work breaks in friendly conversations, and that the statements were isolated and innocuous and were not threats or promises of the Company.

*Id.* at 1257. *See also NLRB v. M&W Marine Ways, Inc.*, 411 F.2d 1070 (5th Cir. 1969) (action of supervisor in casual conversation does not necessarily violate § 8(a)(1)). *Pioneer Drilling Co. v. NLRB*, 391 F.2d 961, 964 (10th Cir. 1968). The exemption from liability conferred by these decisions can be explained on two grounds. First, a few casual words may lack the sufficient force to dampen unionist energies. *E. g., NLRB v. M&W Marine Ways, Inc., supra*, at 1073.[7]

---

5. *See also Jays Foods, Inc. v. NLRB*, 573 F.2d 438, 445 (7th Cir. 1978); *Altman Camera Co. v. NLRB*, 511 F.2d 319, 321 (7th Cir. 1975) (since no repudiation of supervisors, company was liable): *International Union of E. R. & M. W., AFL–CIO v. NLRB*, 138 U.S.App.D.C. 249, 426 F.2d 1243, 1246 (1970).

Other cases focus on the alleged illegality of supervisory acts while assuming, without explications, that if the conduct is illegal, it is attributable to the employer. *NLRB v. Pope Maint. Corp.*, 573 F.2d 898 (5th Cir. 1978); *Hendrix Mfg. Co. v. NLRB*, 321 F.2d 100, 104 (5th Cir. 1963); *NLRB v. New England Tank Industries, Inc.*, 302 F.2d 273, 1st Cir., *cert. denied*, 371 U.S. 875, 83 S.Ct. 147, 9 L.Ed.2d 114 (1962). *NLRB v. Milco, Inc.*, 388 F.2d 133, 137 (2d Cir. 1968). *See also, NLRB v. Neuhoff Bros. Packers, Inc.*, 375 F.2d 372, 374 (5th Cir. 1967).

6. If anything, conduct by high ranking Big Three officers tended to corroborate an impression of Company-wide antipathy to the Union. In the middle of the campaign, the plant manager held a meeting to promise greater responsiveness from management, apparently to mini-

mize any perceived needs for a union. Additionally, the Company's unfair labor practices at other facilities were familiar to workers at the Bayport plant. *E. g., NLRB v. Big Three Industries, Inc.*, 497 F.2d 43 (5th Cir. 1974); *NLRB v. Big Three Welding Equipment Co.*, 359 F.2d 77 (5th Cir. 1966). This background and, later, the discriminatory suspension of Fairless and Coryell enhanced appearances that the supervisors represented their employer in the anti-union campaign.

7. *Compare Sturgis Newport Bus. Forms, Inc. v. NLRB*, 563 F.2d 1252, 1256–1258 (5th Cir. 1977) *with NLRB v. Huntsville Mfg. Co.*, 514 F.2d 723, 725 (5th Cir. 1975), and *NLRB v. Mueller Brass Co.*, 509 F.2d 704, 707 (5th Cir. 1975). These cases consider whether statements by supervisors actually tended to be coercive and in assessing the effect of employee interrogations, the company rank of the speaker as well as the setting of the discussion are relevant criteria. *E. g., Mueller Brass Co. v. NLRB*, 544 F.2d 815, 821 (5th Cir. 1977). These cases have no direct bearing, though, on

Second, scattered anti-union remarks that are spoken among friends might appear to be independent conclusions of the supervisors rather than the product of organized Company resistance. In the present case, no one calls harmless such patently coercive themes as plant closing, blacklisting and company spying. Because such· activity constituted obvious interference, the Company instead argues that the congenial context dislodged any basis for responsibility. We disagree.

The coercion by Big Three supervisors was not isolated. We do not face a single conversation such as that immunized in *Dierks Forests, Inc. v. NLRB*, 385 F.2d 48, 50 (8th Cir. 1967), or *Pioneer Drilling Co. v. NLRB*, 391 F.2d 961, 964 (10th Cir. 1968). Nor were acts of interference thinly spread among 500 employees during an eighteen month period as occurred in *Federal-Mogul Corp. v. NLRB, supra.* In the present case, we confront some fifteen separate items of coercion directed at 35 workers and concentrated within the two months of the union drive.

Further, there is no showing that these inhibitive exchanges transpired in casual settings that obviated the usual work place relationships. Respondent has not asserted that anti-union remarks issued between old friends at a bar, the situation in *Dierks Forests, Inc., supra,* or that the speaker expressly disclaimed any authorization by the Company as in *Schwob Mfg. Co. v. NLRB*, 297 F.2d 864, 869 (5th Cir. 1962). Also missing is the express finding of long standing friendship between speaker and listener, a salient feature of *Federal-Mogul Corp. v. NLRB, supra,* and *NLRB v. M&W Marine Ways, Inc.* Here, only one incident,

a conversation between Supervisor Lindsay and employee Trojanowski, involved good friends. The friendliness of two other supervisors, Park and Richardson, is subject to serious factual dispute.[8] Further, we emphasize that social relationships in themselves are not a sufficient basis to lift acts of illegal interference from the scope of the Company's responsibility. Friends can unlawfully threaten their friends. Indeed, warnings of Company retaliation cast as friendly advice from a familiar associate might be more credible, hence, more offensive to § 8(a)(1) than generalized utterances by distant Company officials. To escape liability, Big Three must establish that the specific contexts of union-chilling remarks negated the Company's presumed authorization. Such a burden has not been met. Several coercive encounters occurred behind the closed doors of a company office. With other alleged interference, the record does not indicate the setting, but we emphasize that the Company bears the burden of showing that particular supervisory acts occurred in social rather than business environments.[9]

The one criterion weighing against imputed liability is the low Company rank of Lindsay, Richardson and the rest. This alone, however, cannot absolve the employer. In *NLRB v. Kaiser Agr. Chem. Div. of Kaiser A&C Corp.*, 473 F.2d 374, 384 (5th Cir. 1973), we said: "The company asserts, however, that the unfair labor practices were not serious since they were committed only by 'lower-level supervisors.' The law is to the contrary. An employer is responsible for the acts of its supervisors." Any other conclusion would encourage compa-

---

the related but different question of employer responsibility.

**8.** Park's professed union sympathies were characterized as "corporate b____ sh____." by one worker. The Company contends that Richardson did not act in its behalf because he reported anti-union measures to union supporters. We observe that these reports, irrespective of Richardson's loyalties, carried a message of Company retaliation against union adherents, a message inimical to § 8(a)(1). Moreover, Richardson's role in the discriminatory

suspension of two pro-union workers convincingly belies the claim that he served the Union.

**9.** The ALJ did not separately examine the context of each item of supervisory interference to ascertain whether the employer's authorization had attached. In his written opinion, he equated "agent" with "supervisor." Big Three Industrial Gas & Equipment Co., case 23–CA–6190 at 4–5 (1977). Lacking some showing that these supervisors did not represent their employer, it was enough that the guilty persons were determined to fall within § 2(11).

nies to channel coercion through the lower levels of management.

We conclude that the words and acts of Big Three's supervisors intruded unacceptably upon prerogatives safeguarded by the National Labor Relations Act. The employer failed to repudiate its supervisors at the time they interfered with protected rights; the disavowal attempted in this appeal comes too late. Holding that Big Three is responsible for these unfair labor practices, we enforce the appropriate portion of the Board's order and decision.

### Section 8(a)(3): The Suspension of Fairless and Coryell

Section 8(a)(3) of the Act prohibits discrimination in regard to tenure or other conditions of employment to discourage union membership. *American Ship Building Co. v. NLRB*, 380 U.S. 300, 311, 85 S.Ct. 955, 13 L.Ed.2d 855, 863 (1965). The Board found that Big Three committed such unlawful discrimination by the three-day suspension of union supporters Fairless and Coryell. With this determination, the Board reversed the Administrative Law Judge who had concluded that the suspensions were not a consequence of discriminatory intentions, but resulted from the enforcement of a valid Company rule.

■ Both workers admittedly disobeyed a Company directive by leaving the premises without punching their time clocks or notifying a supervisor. We emphasize, though, that an otherwise valid rule may not be discriminatorily applied to penalize those who assert rights protected under the Labor Act. When selective enforcement is propelled by union animus, the strictures of § 8(a)(3) are contravened. *See e. g., NLRB v. Heck's, Inc.*, 386 F.2d 317, 320 (4th Cir. 1967). In the case before us, a claim of discriminatory selective enforcement arises because the employer suspended only the union supporters, Fairless and Coryell, while a third rule breaker, Judd, who had not signed a card, suffered just a mild reprimand.

To establish that this disparate treatment was unlawful, it must be shown that the employer's conduct was inspired by anti-union motivation, which is the primary determinant of § 8(a)(3) violations. *NLRB v. Great Dane Trailers*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). The Administrative Law Judge found no intentional discrimination because Superintendent Borey, who ordered the suspension of Fairless and Coryell, was unaware of Judd's transgression. Since Borey applied the same sanction to the only rule violators known to him, he was innocent of conscious discrimination.

While the Board did not dispute factual findings by the Administrative Law Judge, it reached a contrary result through a different legal analysis of the suspensions. Accepting that Superintendent Borey was unaware of Judd's rule-breaking, the Board focused on the action by a Company operative who did know that all three workers had broken the Company rule. Supervisor Richardson had observed Fairless, Coryell and Judd leaving the plant without punching out. Yet Richardson reported only the two union supporters for disciplinary action. This intentional disparate treatment was held by the Board to constitute an unfair labor practice.

■ In assessing conflicts between the Administrative Law Judge and the Board as to conclusions rather than specific factual findings, we must defer to the Board if their determination is supported by substantial evidence. *NLRB v. W.R. Grace & Co., Const. Products*, 571 F.2d 279, 282 (5th Cir. 1978); *Russell-Newman Mfg. Co. v. NLRB*, 407 F.2d 247, 249 (5th Cir. 1969). In the present case, we find ample warrant for the Board's conclusion. The proscription of § 8(a)(3) encompasses more than ultimate punitive decisions inflicted upon union advocates. Intermediate conduct that is causally connected to eventual anti-union action will affront § 8(a)(3) if impelled by union animus. *Cf. NLRB v. O. A. Fuller Super Mkts., Inc.*, 374 F.2d 197, 200 (5th Cir. 1967). Here, Richardson's report formed the basis for the suspensions and thus unquestionably contributed to the punishment of union adherents. Equally

clear is the anti-union motive behind Richardson's action. Illegal purpose may be inferred from the fact that, although three workers disobeyed the rule, Richardson reported only the union supporters. *Cf. NLRB v. Great Atlantic & Pacific Tea Co.,* 409 F.2d 296, 298 (5th Cir. 1969). Further compelling evidence is found in Richardson's statement to Judd not to worry because the Company was not after him.

We find substantial evidence that the Company violated § 8(a)(3) when Richardson, its supervisor, insured that only union adherents would be punished for their rulebreaking. The Board's order and remedy for the unlawful suspension of Fairless and Coryell is enforced.

*Section 8(a)(3): The Discharge of Every Maintenance Worker*

 The most serious violation of the Act found by the Board was the allegedly discriminatory discharge of all thirty-four workers in the maintenance department. The Company defended this termination as a necessary response to a rash of problems erupting in the maintenance unit during July and August. The Board rejected the Company's asserted justification as a deception painted over actions more accurately characterized as the retaliatory firing of union supporters. While we find some truth in the claims of both parties, considerations of policy and law compel affirmance of the Board.

This court has recently decided a case in which the jobs of an entire workforce were weighed against a myriad of destructive acts directed at an employer. In *Johns-Manville Products Corp. v. NLRB,* 557 F.2d 1126 (5th Cir. 1977), the court condoned the wholesale disemployment of a 107-man workforce by an employer wracked with weeks of extensive sabotage and spiralling financial losses. In the present case, respondents seek an extension of *Johns-Manville* to immunize the Company's jettisoning of some thirty-four employees in the problem-plagued maintenance department. The Board argues that our decision of *Johns-Manville* is unprecedented and urges that we confine the case to its particular factual setting.

Our starting point is the recognition that Big Three's purported justification for the allegedly discriminatory decision to subcontract differs qualitatively from the usual business explanations proffered in such cases. Here, the unit replacement is not an asserted consequence of changed business conditions, subcontracting economics or other forces of universal application to each worker. *E. g., NLRB v. Gopher Aviation, Inc.,* 402 F.2d 176, 183 (8th Cir. 1968). In the present case, Big Three's drastic response was to misconduct by a few workers within the maintenance unit—a condition that was neither inevitable nor incapable of differentiated response. Courts have long been loathe to countenance an infliction of punishment upon many for the misdeeds of a few. "Certainly all the employees should not be deprived of the benefits of the Act because certain undisclosed ones forfeited their rights." *Stewart Die Casting Corp. v. NLRB,* 114 F.2d 849, 856 (7th Cir. 1940). "The violence of these two employees . . . is not, however, to be imputed to [the] other union members in the absence of proof that identifies others as participating in such violence." *NLRB v. Mt. Clemens Pottery Co.,* 147 F.2d 262, 268 (6th Cir. 1945).[10] The exception created in *Johns-Manville* arose from extreme circumstances—circumstances threatening the economic survival of the

---

10. *See also NLRB v. Moore Business Forms, Inc.,* 574 F.2d 835 (5th Cir. 1978) (fact that some of 31 strikers were guilty of misconduct did not justify the company's refusal to rehire any of the 31); *American International Aluminum Corp.,* 149 NLRB 1205 (1964) (Board proscribed termination of entire production crew due to slowdown by unspecified persons; em-

ployer's motivation deemed suspect). Even an employer's honest, but mistaken, belief that certain union adherents were planning acts of sabotage did not excuse the discharges of these men. *NLRB v. Burnup & Sims,* 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1974). *See also* 29 U.S.C. § 106 (1970).

plant and effectively denying its use to the employer. At least three factors distinguish *Johns-Manville* from the present case: the severity of misconduct, the complete absence of anti-union animus, and the employer's exploration of alternatives to permanent replacement of the workforce. Finding these features inapposite to the present case, we refuse to extend *Johns-Manville* to exempt Big Three's mass discharge of 34 maintenance workers.

A necessary predicate to the *Johns-Manville* holding was the determination that, as a matter of law, an in-plant strike had occurred. Because the personnel were deemed strikers, the discharge and permanent replacement of the entire workforce was held to be sanctioned under *NLRB v. MacKay Radio & Telegraph Co.*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938).[11] Thus the *Johns-Manville* methodology requires a preliminary determination whether misconduct reached dimensions of severity to become functionally equivalent to a strike. While some wrongdoing occurred in the present case, such activity fell far short of the weeks of sabotage inflicted in *Johns-Manville*. In that case, the employer was repeatedly forced to halt production resulting in large losses to the company. By contrast, Big Three did not suffer even a fleeting interruption in its manufacturing processes and the main financial loss stressed by the respondent in the record is the $4,000–$5,000 repair bill for two damaged machines.[12] Additionally, in *Johns-Manville*, the court confronted more widespread acts of destruction conducted over a much longer period of time. This arguably suggests involvement or at least tacit approval, of more than a couple of workers. In the present case, telephone threats and related conduct were almost exclusively confined within a thirty-six hour period and were evidently the work of a few individuals.[13] We are reluctant to derive a strike by an entire department from conduct that may have represented only one or two embittered workers. Finally, in assessing whether particular misconduct was sufficient to impose the status of a striker upon every worker, we note that in *Johns-Manville* life and limb were actually jeopardized at least once as scrap metal was jammed

11. *MacKay* held that economic strikers—workers engaged in protected activity and free from any wrongdoing—could be replaced so that an employer could continue to run his business. In a related fashion, *Johns-Manville* authorized the replacement of workers, including those innocent of wrongdoing, where no realistic alternative would permit company operations to continue. Thus, the "in-plant strike" characterization, as used in *Johns-Manville*, evidently connotes a level of misconduct so outrageous as to significantly impair continued operations by the employer. Because the misconduct in that case was continuing without an end in sight, *Johns-Manville* can be distinguished from the cases cited by Judge Wisdom involving employer sanctions after the fact of specific items of employee misconduct. Clearly, an employer punishing past wrongs must separate the guilty from the innocent. Arguably an employer faced with an unstoppable flood of misconduct may be unable to make a differentiation. One Student commentator agrees with Judge Wisdom. *See* Recent Decision, 12 *Ga.L. Rev.* 131 (1977). A petition for certiorari in the *Johns-Manville* case has recently been denied. *See Oil, Chemical & Atomic Workers v. Johns-Manville Products Corp.*, 557 F.2d 1126 (5th Cir. 1977), cert. denied, 46 U.S.L.W. 3766 (1978).

12. At the Johns-Manville facility, the company manufactured organic felt. Breaks in the sheets could be accomplished by striking a water mixture or finished sheet with one's finger or some utensil. These paper breaks could be "carried out surreptitiously, making it difficult if not impossible to observe the guilty individual or individuals." 557 F.2d at 1128. This activity, which commenced around August 22, 1973 reaching a crescendo on October 22, was compounded by deliberate destruction of machinery and an intentional disconnection of an electrical switch causing a complete shutdown of the mill.

In the present case, the principal damage actually inflicted was to two machines. As the Board points out, the Company's report on maintenance department misconduct did not include any mention of such damage.

13. We further note that there is no reason to believe that the identities of the actual culprits were known to the other workers. The placement of phone calls, the nighttime firing of gunshots and other misdeeds were not committed in the midst of fellow employees during work hours.

into a machine. If undetected, this action would have caused a serious explosion. In the present case, no actual prospect of harm ever arose at the Big Three job site. While Big Three endured serious mischief, the misconduct did not effectively deny the employer the benefit of his workers' energies, which is the essence of striking.

A second crucial feature of *Johns-Manville* is the complete absence of anti-union motivation in that case. Anti-union purpose is the principle determinant of § 8(a)(3) violations. *NLRB v. Great Dane Trailers*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). While no basis existed for suggesting actual discriminatory intentions behind the terminations in *Johns-Manville*,[14] the present case is fraught with statements and actions providing substantial evidence for the Board's finding that antipathy toward unionism spawned the maintenance unit dismissal. One circumstance suggesting discriminatory intentions is the fact that the subcontracting decision followed right on the heels of the sharp skirmishes in the union drive. *NLRB v. National Food Stores, Inc.*, 332 F.2d 249, 252 (7th Cir. 1964). Another factor indicating improper motive for the mass discharge is the presence of other unfair labor practices during the period leading up to the unit termination. *NLRB v. Big Three Industries, Inc.*, 497 F.2d 43, 49–51 (5th Cir. 1974). Specifically, the § 8(a)(1) violations found in statements by supervisors and the § 8(a)(3) discrimination underlying the suspension of Fairless and Coryell support the conclusion that anti-union spite prevailed in the decision to replace the maintenance workforce. Moreover, we would be less suspicious of the Company's real purpose had it not reached the subcontracting decision so hastily but instead had explored means for curing its problems that did not jettison its workers. In sum, these indicia of purpose provide abundant support for the finding that anti-union animus pervaded the Company's action.

However, even though we endorse the Board's finding of anti-union animus, we do not entirely discount the Company's assertions that honest business purposes contributed to its decision to subcontract. The Board did not specifically discredit the words of company officials who attested to the legitimacy of their business justification. Furthermore, we do not doubt that a company with a trouble-ridden workforce would want to eliminate further inconvenience and expense by eliminating the workforce. Cf. *NLRB v. R. C. Mahon*, 269 F.2d 44, 47 (6th Cir. 1959) (added costs of unionism a legitimate consideration). This seems especially plausible because the company had subcontracted its maintenance work in the past and only since 1975 had the Company directly employed people for the job.

Accepting the Board's finding of anti-union motivation, and yet assuming the existence of some legitimate business purpose, we are found with a decision activated by two goals: one legitimate, and one that we must condemn. In this circuit, the threshold for illegality is crossed if the force of invidious purpose is "reasonably equal" to the lawful motive prompting conduct. *Cramco, Inc. v. NLRB*, 399 F.2d 1, 6 (5th Cir. 1968).[15] While we cannot fix precise

---

**14.** The Board found that § 8(a)(3) was violated notwithstanding the absence of evidence of actual discriminatory intent. Relying upon the rule of *per se* discrimination enunciated in *NLRB v. Great Dane Trailers*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), the Board concluded that the mass discharge of the Johns-Manville workforce was "inherently destructive" of "important employee rights" thereby eliminating the need to show actual anti-union motivation. Johns-Manville Products Corp., 223 NLRB 1317, 1332 (1976).

**15.** *See also NLRB v. Longhorn Transfer Service, Inc.*, 346 F.2d 1003, 1006 (5th Cir. 1965);

*NLRB v. Hudson Pulp & Paper Co.*, 273 F.2d 660, 666 (5th Cir. 1960). In fact, the threshold for illegal motive may not require a "reasonable equality," but may, according to some cases, be met if invidious purpose is part of the decision at issue. *NLRB v. O. A. Fuller Super Mkts., Inc.*, 374 F.2d 197, 200 (5th Cir. 1967); *NLRB v. American Mfg. Co. of Texas*, 351 F.2d 74, 79 (5th Cir. 1965). This less exacting standard represents the prevailing view among other circuits. *Jeanette Corp. v. NLRB*, 532 F.2d 916, 920, n.5 (3d Cir. 1976); *NLRB v. Elias Bros. Restaurants, Inc.*, 496 F.2d 1165, 1167 (6th Cir. 1974); *NLRB v. Central Press of Cal.*, 527 F.2d 1156 (9th Cir. 1975). The most exact-

percentages for the motivational ingredients of Big Three's action, we do say that the employer has failed to establish that business justification was dominant. The Board dismissed Big Three's purported justification as a sham; we find this justification subsidiary to the force of union animus in triggering the mass discharge. Accordingly, the motivational predicate for § 8(a)(3) violations is established.[16]

In addition to the severity of misconduct, and the purpose behind resulting discharges, a third factor compellingly distends this case from the reach of *Johns-Manville*. The employer in that case exhausted various alternatives before resorting to the unusual and severe solution of unit-wide job termination. In *Johns-Manville*, the employer endured weeks of destruction, gradually accelerating its responses to the spiralling destruction. The Company twice consulted with union leaders asking their help in combatting the tide of disruption. When that failed, brief lay-offs were effected in the hope of deterring future sabotage. Next, the Company tried to operate with temporary replacements of its trouble-ridden workforce. None of these measures, however, impeded the flow of the vandalism. Then, after weeks of harm created unacceptable job place tensions, and monthly losses to the Company averaging $300,000, the employees' jobs were terminated. This exhaustion of alternatives contrasts profoundly with the action of the Big Three employer. Here, an employer faced with much less onerous mischief, reacted almost reflexively and without considering the jobs

and livelihood of its workers. Just five days after the series of threatening phone calls, the Company responded to its problem with the solution most injurious to its employees and their rights under the Labor Act. So swift and harsh a reaction is not acceptable. It tainted the employer's intentions; further, it cast honest workers into unemployment along with the few miscreants even though such an unfairness might have been avoided.

 We do not say that a company plagued with overwhelming troubles from a work unit must invariably endure industrial turmoil until any particular level of harm has accumulated for a court to permit termination of the workforce. But we do say that in this case the Board's conclusion that matters had not reached such a pass is supported by substantial evidence. The Draconian measure of unit-wide job information is not to be lightly countenanced. The stake of workers in their company is a substantial one. Their employment represents a means of paying bills and supporting their families. It may also reflect the years of hard work and pride invested to better the company and enhance their own job security. This interest of workers is obliterated by job termination. When an entire unit is discarded, the impact on these men and women, and all who would support unions, is profound. "No conduct more drastic, or more likely to have lingering, ineradicable effects can be imagined." *NLRB v. Townhouse T. V. & Appliances, Inc.*, 531 F.2d 826, 830 (7th Cir. 1976).[17] We

---

ing test is the preponderant motive or "but for" standard of the First Circuit. *Stone & Webster Engineering Corp. v. NLRB*, 536 F.2d 461, 464–465 (1st Cir. 1976). While Judge Thornberry has ably refuted any contention that such a strict test operates in this circuit, *Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1263–1265 (Thornberry, J., specially concurring), even a "but for" test would be met in the instant case.

**16.** The Company insists that, at the time of the mass discharge, the union campaign had already failed and become a "dead issue." This claim was rejected as the ALJ specifically determined that organizational efforts continued up to the time of the decision to subcontract.

**17.** The special concurrence suggests that *Johns-Manville* permits some anti-union motivation in a decision to replace a workforce. We note, though, that the Board as well as a majority in that case specifically found that no anti-union animus was present; in fact, the union did not even assert its existence. 557 F.2d at 1133. As the concurrence points out, an employer engulfed with acts of sabotage may evince hostility toward an intractable workforce. Indeed, the employer in *Johns-Manville* evidently expressed such exasperation. 557 F.2d at 1131. Hostility toward particular workers, however, or even a personal dislike of union operatives is not anti-union animus lying at the core of the proscription of § 8(a)(3). This provision addresses antipathy

conclude noting that respondent does not challenge the Board's provisions for remedy—a prescription that includes reinstatement, back pay, and the posting of appropriate notice. Such relief is fully authorized by the Act, *e. g., NLRB v. American Mfg. Co. of Texas, supra,* and clearly demanded by the facts of this case. The decision and order of the Board is hereby

ENFORCED.

GEE, Circuit Judge, Specially Concurring:

I concur in the result and in all of the court's opinion save its ascertaining of a "complete absence of anti-union animus" as a factor which distinguishes this from the *Johns-Manville* situation.[1] In the first place I do not think there was such a complete absence in *Johns-Manville*; an employer who gives as some of his reasons for a lock-out "the Union's unreasonable demands, unresponsive attitude and willful acts, as well as [a] history of sabotage" as did *Johns-Manville* (557 F.2d at 1131) seems to me to be rather clearly evidencing *some* animus against the union. In the second, I think it somewhat unrealistic to expect employers under the sort of attack evidenced by the facts of *Johns-Manville* to preserve an entire absence of anti-union animus. If this be made a condition of relief, only saints will receive it.

toward the assertion of rights of self-organization, that encourages or discourages union membership. In *Johns-Manville*, there was no indication that the right to unionize and bargain collectively was resented. In fact, the employer's bargaining history reflected otherwise. By contrast, in the present case, the employer fought the very existence of a union resisting and undermining protected rights of self-organization. Such animus creates not only a compelling distinction from *Johns-Manville,* but it raises the fundamental determinant of § 8(a)(3) liability. Indeed, ordinarily, when an employer displaces his workforce by sub-

contracting, the question of § 8(a)(3) liability turns on the issue of motivation. *Compare NLRB v. George J. Roberts & Sons, Inc.,* 451 F.2d 941 (2d Cir. 1971) (anti-union purpose behind subcontracting) *with NLRB v. Gopher Aviation, Inc.,* 402 F.2d 176 (8th Cir. 1968) (years of financial loss mandated subcontracting). The present case, however, involves the extraordinary claim that a unit-wide job termination is justified due to unprotected acts by a fraction of the workforce.

1. *Johns-Manville Products Corp. v. N. L. R. B.,* 557 F.2d 1126 (5th Cir. 1977).