**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, LOCAL #517, AFL, Respondent.**

**No. 5037.**

United States Court of Appeals First Circuit.

Heard Dec. 6, 1955.

Decided Feb. 28, 1956.

Harold Kowal, Field Atty., Boston, Mass., with whom Theophil C. Kammholz, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Samuel M. Singer and Nancy M. Sherman, Washington, D. C., Attys., were on brief, for petitioner.

Sidney W. Wernick, Portland, Me., with whom Berman, Berman & Wernick, Portland, Me., were on brief, for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition by the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, as amended 61 Stat. 136, 29 U.S.C.A. § 151 et seq., for enforcement of its order issued on May 12, 1955, against respondent, United Brotherhood of Carpenters and Joiners of America, Local #517 AFL, Portland, Maine.

At all times here relevant, a contract containing the following provisions, among others, was in effect between the Gil Wyner Construction Company and the Union:

"Article VII

* * * * *

"*Section 2.* The Employer agrees that no Carpenter who is a member of Local 517, United Brotherhood of Carpenters and Joiners of America,

will be assigned to work, or expected to work, or required to work, on any job or project on which any worker, or person, has been performing, is performing, or will perform, any work within the jurisdiction of any of the craft unions, A. F. L., if said worker or person is not a member of the particular craft union within whose jurisdiction the work lies.

"*Section 3.* If at any time, during the life of this Agreement, it shall become permissible and legal, under Federal Law, for the following Sections herewith designated, Sections 3(a) and 3(b), to be incorporated as part of this contract, it is hereby agreed that from that time or until the expiration of this Agreement, these said Sections shall automatically become effective and in force as part of this Agreement, to wit:

"*Section 3(a).* The Employer agrees to employ carpenters who are members of the Union to do all carpenter work within the Union's jurisdiction as long as the Union is able to supply the Employer with reliable, competent and otherwise acceptable workmen in sufficient numbers to meet the Employer's requirements. The Union agrees that if after twenty-four (24) hours notice it has not furnished a sufficient number of Journeymen to the Employer giving such notice, then the Employer may employ such men as he can obtain to perform the work until such time as the Union can supply men to the Employer to replace these men. The Employer agrees that when he employs men, in the manner described above, that he will give notice of such employment to the Union containing the names and addresses of these men within forty-eight (48) hours, providing that they are qualified carpenters.

"*Section 3(b).* The Union agrees to give preference in furnishing workmen to the Employer, and the Employer agrees to give preference in the employing of workmen to members of the Union. The Employer agrees that any carpenters who are not members of the Union shall within forty-eight (48) hours apply to the Union for membership, and that they will continue in employment as long as they are members of the Union."

The trial examiner found, and the Board adopted his finding, that despite the provision purporting to defer the operation of Sections 3(a) and 3(b) of Article VII to some indeterminate future time, the actual intention of the parties was that these provisions should be given immediate implementation. The Board further found that the Company and Union did in fact give effect to said Sections 3(a) and 3(b). In support of its view that the Company and Union did in fact maintain a system of discriminatory hiring practices, the Board relied, in part, upon the treatment accorded one Ambroise Desjardins who unsuccessfully sought employment as a carpenter at the Company's Portland bridge job in April, 1954.

Desjardins first began to work for Gil Wyner on July 19, 1951, on a job near Bangor, Maine. He was at that time a member of Local #621. In September, 1952, he went to the Brunswick Naval Airbase and applied to the same company for a job there. The timekeeper told him to get a working permit from Local #517. Desjardins applied that same day to Joseph Vanier, Business Agent of Local #517, but was refused a working permit because of a dispute then current between the Local and the Company.

On January 5, 1953, Desjardins again spoke to Vanier, turning over to him his Bangor union book.

On January 6, 1953, Desjardins went to work for Gil Wyner, and on January 19, 1953, he became a member of Local #517.

On February 2, 1953, Vanier formally charged Desjardins with having violated

the constitution and laws of the Union by going to work for Gil Wyner at a time when the Local was engaged in a dispute with the Company over a question of traveling time.

On July 6, 1953, Desjardins was fined $100 by the respondent, and on August 17, 1953, he paid $50 of this fine.

On September 10, 1953, he appealed his fine to M. A. Hutcheson, General President, but was not successful in gaining a hearing.

In November, 1953, Desjardins left the job in Brunswick, transferring to the Portland bridge job, where he worked until sometime in January, 1954 when he was laid off for the winter.

In January, 1954, he tendered his dues to Vanier but the tender was refused because he had not paid the balance of his fine. Several subsequent tenders made prior to April 1, 1954, were likewise refused.

On or about April 1, 1954, Desjardins applied for work to Charles Ablondi, a member of Local #860, Framingham, and a Company foreman who had authority to hire.

Desjardins testified:

"Q. Now, tell us as best as you recall what you said to him (Ablondi) and what he said to you?

\* \* \* \* \*

"A. I talked to him, and I asked him for work. He said we are getting a gang started; go get a working permit from the local union and come back the following Monday.

"Q. And what did you say to him? A. I said 'O. K.' I went down to the local union and asked for a permit.

"Q. And when was that? A. The same day.

"Q. And with whom did you talk? A. Joseph Vanier, Jr.

"Q. Was anyone present at that time? A. No.

"Q. What did you say to him? A. I told him I had a job and that I wanted to get a working permit to go to work.

He said you cannot get a working permit until the fine is paid and the back dues.

"Q. And what did you say to him? A. I said I was going to pay the back dues but not the fine.

"Q. Was that the end of the conversation? A. Right."

On April 6, 1954, Desjardins turned his book in to Vanier and told him that he was going to work non-union.

The trial examiner found, and the Board adopted his finding, that Ablondi did in fact refuse to employ Desjardins until he had secured union clearance, and that the Union was responsible for Ablondi's illegal conduct.

With respect to the legality or illegality of the contract itself, the respondent contends that the Board's finding that Local #517 executed, maintained, and enforced an unlawful Union security agreement with the Gil Wyner Construction Company—as constituted by Article VII, Sections 3, 3a and 3b—is erroneous because unsupported by substantial competent evidence on the record as a whole.

The Board based the above finding in part upon the testimony given by Joseph Vanier, the Business Agent of Local #517:

"Q. (By Mr. Kowal) Was Gil Wyner in 1953 and 1954 a union contractor? A. Right.

"Q. And what was a union contractor? A. A union contractor is a contractor that agrees to employ union men if the same can be had."

The respondent Union seeks to avoid the effect of this testimony by asserting that it represents only Vanier's conclusion as to the existence of a separate informal agreement between Gil Wyner and Local #517 and argues that: "None of the subsidiary facts are set forth on the basis of which Vanier offers his indirect conclusion that a separate oral agreement has been reached."

This argument is not persuasive. Vanier was precisely the man who would be charged by the Union with the prac-

tical administration of any unlawful hiring practices to which the Company and the Union might have agreed. Without regard to whether or not Vanier was correct in his conclusion that the Company had agreed " * * * to employ union men if the same can be had," it seems to us clear that if Vanier thought that such an agreement had been made, and if the Company and the Union permitted him to conduct himself accordingly, then for all intents and purposes an illegally discriminatory hiring practice was thereby put into effect even if there had been no such prior agreement.

Respondent also contends that the weight given to Vanier's testimony to the effect that the Company was a union contractor is " * * * insignificant in view of the record as a whole." It is a sufficient answer to this contention that the trial examiner and the Board could properly give credence to the testimony of Vanier in so far as it tended to establish the existence of the discriminatory practices, and at the same time disbelieve those portions of his testimony which carried a contrary import. We conclude that substantial evidence on the record considered as a whole supports the Board's finding that the respondent Union executed, maintained, and enforced an unlawful union-security agreement with the Company in violation of Section 8(b) (1) (A) and (2) of the Act.

With respect to Desjardins' unsuccessful application for employment in April, 1954, the Board found, and there was substantial evidence to support the finding, that Ablondi did in fact discriminate unlawfully against Desjardins' aplication because Desjardins had not obtained Union clearance. The respondent attempts to exculpate itself from liability for the conduct of Ablondi by asserting, first, that Ablondi was not acting as its agent; and, secondly, that the respondent had not "caused" Ablondi's conduct.

Without pausing to consider the agency question, we believe that Ablondi,

in discriminating against Desjardins, was acting pursuant to the illegal hiring practices for which the Union had contracted, and therefore that the Union "caused" the Company to discriminate unlawfully against Desjardins, thereby violating Section 8(b) (1) (A) and (2) of the Act.

Completely apart from the discriminatory acts of Ablondi, it seems to us clear that the Union itself directly violated Section 8(b) (1) (A) and (2) of the Act when it refused to give Desjardins the clearance which the Company required pursuant to the discriminatory hiring practices for which the Union had contracted.

Although substantial additional evidence could be adduced in support of the conclusions of the Board we regard the above recited reasons as sufficient.

A decree will be entered enforcing the order of the Board.