PIONEER DRILLING CO., Inc.,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 9618.

United States Court of Appeals
Tenth Circuit.

April 5, 1968.

George C. Dunlap, of Blanchette, Smith & Shelton, Dallas, Tex., for petitioner.

Robert S. Hillman, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Lawrence M. Joseph, Washington, D. C., were with him on the brief), for respondent.

Before PICKETT, LEWIS and BREITENSTEIN, Circuit Judges.

DAVID T. LEWIS, Circuit Judge.

This case reaches us through the petition of Pioneer Drilling Co., Inc., pursuant to section 10(f) of the National Labor Relations Act, as amended, 29

U.S.C. § 151 et seq., to review an order of the National Labor Relations Board. The Board has cross-petitioned for enforcement of its order. The Decision and Order of the Board, substantially an adoption of the recommended order of the trial examiner, appears at 162 N.L. R.B. No. 85 and was issued January 13, 1967. In summary, the Board found that Pioneer had violated (one or both) of sections 8(a) (3) and (1) of the Act by discriminatorily discharging employees McAlister, McCay, Helms, Stratton and Phelps; discharging supervisors Ludgate and Brister; discharging McAlister a second time; coercively interrogating employee Yenne; refusing to hire and coercively interrogating one Therman C. Long; engaging in surveillance; creating the impression of surveillance; and confiscating union authorization cards.

Petitioner contends that not one of the findings of violation is supported by substantial evidence upon consideration of the record as a whole and asserts that the trial examiner "has carefully sifted the evidence in one direction only to arrive at his preconceived destination."

█ In view of the unusual number of separate violations found, the determination of the trial examiner in nearly every instance that the testimony of the several witnesses was credible in part and incredible in part, and the setting out in great detail of some findings that might well be deemed protective only,[1] we have considered this record with more than routine care. We conclude, however, that the case is one dependent upon credibility and thereafter the permissible inferences to be drawn therefrom and, so viewed, we are constrained to hold that the basic findings of the Board are supported by substantial evidence and that the orders of the Board, with one exception, should be enforced. Practicality prevents a discussion in detail of each aspect of the case.

Pioneer is engaged in oil well drilling in various western states including Utah and Wyoming and has drilling operations at Vernal, Utah and Bairoil, Wyoming. Pioneer's drilling rig # 4 was located at Vernal and rigs # 5 and # 6 at Bairoil. A drilling crew at a rig at any one time consists of four men, a driller, a derrickman and two floormen. All rigs in a certain area are supervised by a "toolpusher" who is immediately over the drillers. It is stipulated that drillers and toolpushers are supervisors within the meaning of § 2(11) of the Act. It is accepted practice in the industry that when a driller is hired, he selects his own crew and when he is discharged or terminates his employment, his crew is automatically terminated.

About October 19, 1965, McAlister and Helms, employees on the crews of rig # 5 drillers Brister and Ludgate respectively, secured union cards and succeeded in having several cards signed by various other employees and also by their supervisors, the named drillers.

Approximately one week later, Forest Fry, vice president of Pioneer, received a letter from the Union demanding recognition. Pursuant thereto, on October 28, Fry visited rig # 5 where he queried driller Ludgate and toolpusher Anderson about union activity among the men. Fry and Anderson then went to a little building near the rig where they found union authorization cards in one of the lockers there provided for the men. Fry also had a conversation concerning union activity with driller Wilson at rig # 6. These conversations reflect considerable concern over and unfavorableness toward the union activity.

1. For example, McAlister's second discharge was found to be for union activity and the fact that it followed his being found asleep on the job was seized by Pioneer as a pretext. But the examiner also found that sleeping on the job eighty feet above the ground upon a drill derrick was not uncommon and that Pioneer was at fault in placing McAlister in a position inducive to sleep.

Later the same day Fry went to Vernal, Utah. The company was aware as early as a week before that it was shorthanded at Vernal and Fry on October 22 had told toolpusher Anderson that he was going to have to transfer a driller from Bairoil to Vernal. After this visit driller Ludgate was requested to transfer to Vernal and upon his refusal the same request was made of driller Brister who also refused. Termination resulted as the consequence of their refusal and in keeping with industry practice their respective crews were also terminated.

Despite the Board's finding that the company had a valid business reason for the transfer, it held that it was a pretext for getting rid of the crews of the respective drillers by taking advantage of the customary driller-crew relationship. This finding relied on the facts that other drillers—specifically Sam Anderson, the third driller on rig # 5, Wilson, a driller on rig # 6, and Riddle, who was hired to replace the terminated drillers,—were not requested to transfer; that union activity was centered in the terminated crews consisting of Helms, Phelps and Stratton in Ludgate's crew, and McAlister and McCay in Brister's crew;[2] and that Brister and later Ludgate were rehired by Pioneer despite their refusal to transfer to Vernal.

Pioneer asserts that the drillers could have been fired outright for their pro-union activity, citing General Engineering, Inc. v. NLRB, 9 Cir., 311 F.2d 570; NLRB v. Inter-City Advertising Co., 4 Cir., 190 F.2d 420, cert. denied, 342 U.S. 908, 72 S.Ct. 301, 96 L.Ed. 679, and that therefore the less stringent action of transfer and the subsequent termination for refusal is not violative of the Act. The doctrine has no application here for reason that the Board found that Pioneer's acts were not motivated by the pro-union activity of the supervisors but by that of the employees and thus the supervisors became not the object but rather a conduit of the employer's unlawful acts. The Board's reasoning is sound and its view of the inferences to be drawn from the evidence, while not the only one permissible, is within its expertise.

■ It follows that if, as the Board found and we affirm, the supervisors-drillers were terminated as a pretext for termination of their union-interested crews and the squelching of the union activity, then the resultant termination of the crews constitutes a violation of their collective bargaining rights under the Act.

Pioneer notes that the employees were not discharged but that they were invited to transfer to Vernal. Assuming arguendo that this is true the industry practice that each driller hires his own crew dictated that each employee would go to Vernal at his own risk hoping there to find a driller who would take him on. The fact that employee Stratton elected to take his chances at finding work in Vernal and was successful does not negate the prior fact that the so-called "transfer" had all the indicia of termination.

■ Immediately after employee McAlister was terminated as part of Brister's crew, he was hired by driller Wilson on rig # 6 at Bairoil. Pioneer asserts that this is demonstrative of its good faith; the Board, however, found that this was accomplished without the knowledge of Fry or toolpusher Anderson and that when Anderson found out he instructed Wilson "not to bring any more of the boys over there that refused to go to Vernal" and "he'd have to find out about Dave [McAlister]." Subsequently McAlister was transferred to Riddle's crew and then again discharged. As we have noted, this discharge followed an incident that could well constitute cause but the fact finder found otherwise from conflicting evidence and from attributing partial credibility to

---

**2.** It was McAlister and Helms who had secured and circulated the union cards and the locker in which the cards were found was apparently used by McAlister.

certain testimony. We do not disturb the finding.[3]

The incident premising the Board's finding that Pioneer had violated both sections 8(a)(3) and (1) by refusing employment to and unlawfully interrogating Long can, and we believe should, be viewed in isolation from the activities of company officials in the mainstream of this case. On the evening of December 1, 1965, Long, a roughneck,[4] and Riddle, a driller for Pioneer, met by accident in a bar in Rawlins, Wyoming and began drinking beer. The two had been friends for years and both had independently gone to the tavern to engage in "bar business." Long testified that during the course of his evening with Riddle the following conversational incident occurred:

"Well, Paul [Riddle] says, ' "Ace", you working?' I says, 'No, we just stacked up.' He said he needed a hand. I said I'd go to work for him. He says, 'Did you sign one of them Union cards?' I said, 'I certainly did.' He said, 'Well, I can't use you then.' He said, 'Do you know anybody else around here?' I said I didn't really know because I had just got back to town."

It is undisputed that Riddle, who as a driller was at the lowest level of supervision within the company, had never been authorized to refuse employment because of union adherence, and that the statement thus did not reflect company policy; that Riddle had no authority to hire and fire except for his own crew; that at such time his crew was full although a vacancy might occur; that Long actually was hired by a Pioneer driller two days later and quit on December 6 to return to work for Wind River.

■■ Board counsel now characterize this incident as "when Riddle interviewed Long about employment." We consider this to be unrealistic and unsupported by the evidence. The meeting of the two men was unplanned, informal, social in nature and actually uncoercive in effect. The Board itself has recently considered similar conversations not to be an interference with the rights of employees under the Act. See Tomco Studs Co., Inc., 170 N.L.R.B. No. 48, Case No. 18–CA–2406, March 18, 1968. And under the mandate of Universal Camera Corp. v. NLRB, 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456 it is our duty to see that the "Board keeps within reasonable grounds."

We refuse to enforce the order of the Board in respect to Long. The order will otherwise be enforced.

---

3. This, of course, was not the only occasion where testimony was irreconcilably in conflict. The trier of fact has the burden of determining who to believe and need not give equal weight to conflicting testimony. See NLRB v. Champa Linen Service Co., 10 Cir., 324 F.2d 28, 29–30. Nor is the trier of fact bound to treat the testimony of a witness as an inseverable whole either accepting or rejecting it in toto. NLRB v. United Brotherhood of Carpenters, etc., Local No. 517, 1 Cir., 230 F.2d 256, 259; NLRB v. Universal Camera Corp., 2 Cir., 179 F.2d 749, 754, reversed on other grounds, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

4. Long had been working for Wind River, a competitor of Pioneer.