**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DOWNSLOPE INDUSTRIES, INC., and Greenbrier Industries, Inc., Respondents.**

No. 80–1237.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 2, 1982.

Decided April 29, 1982.

Elliott Moore, Deputy Associate Gen. Counsel, Christine Weiner, N. L. R. B., Washington, D. C., for petitioner.

Alan B. Pearl and Henry C. Woicik, Consol. Corporate Consultants, Inc., Jericho, N. Y., for respondents.

Before LIVELY and MERRITT, Circuit Judges, and TAYLOR, District Judge.*

ANNA DIGGS TAYLOR, District Judge.

The National Labor Relations Board seeks enforcement, pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, of the order which it entered against Respondents on December 14, 1979, and which is reported at 246 NLRB No. 132, 103 LRRM 1041 (1979). For the reasons discussed below, the Board's petition for enforcement is granted in part.

We find at the outset that the factual findings of the Board, which adopted those of the Administrative Law Judge, are supported by substantial evidence on the record considered as a whole, taking into account those matters of record which fairly detract therefrom. Those findings are, accordingly, affirmed here pursuant to 29 U.S.C. § 160(e). *Universal Camera Corporation v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The record includes conflicts in testimony. On such occasions we note that the trier of fact has the burden of deciding whom to believe; need not give equal weight to conflicting histories; and need not treat the testimony of each witness as indivisible, for acceptance or rejection only as a unit. It is, in short, the function of the ALJ to resolve credibility problems. *NLRB v. Rawac Plating Co.*, 422 F.2d 1259 (6th Cir. 1970). In this case, the ALJ has specifically based his credibility findings against Respondents' two management witnesses on his demeanor observations. Moreover, an independent analysis of the evidentiary record confirms the inferences which the ALJ has drawn against Respondents, from the evidence of record.

The Respondents, two corporations with offices headquartered in the same building in New Jersey, were engaged together in September of 1976 in the production of garments for interstate commerce, in a two-story building in Knoxville, Tennessee. Robert Lane, the brother of a Greenbrier principal, directed the activities of both corporations (as plant manager for Downslope and "consulting" plant manager for Greenbrier) from a first-floor office in which the Downslope bookkeeper also prepared payrolls for both corporations. Greenbrier's operations were conducted on the second floor, Downslope's on the first, and the basement loading and storage facility was shared.

The testimony credited by the ALJ reveals that on September 13, 1976, David Jamison began work as Greenbrier's new plant manager to help with the production of chemical warfare suits under a contract with the federal government. Downslope plant manager Robert Lane had promoted Helen Scarlett from machine operator to supervisor of that contract in April, 1976, and she had hired the twenty employees who were there engaged. Both Jamison and Scarlett directed the work of the seamstresses, and both reported directly to Robert Lane.

By Monday, September 20, 1976, Jamison had requested the sexual favors of six female employees, two of whom he had harassed through the weekend at their homes with requests that they visit his motel room to discuss their work; and one of whom he had laid off "until the situation between us is straight." Inasmuch as most of those persons hired by Scarlett shared some relationship, whether of friendship, blood, or

---

* Honorable Anna Diggs Taylor, District Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

marriage, Jamison's conduct had become the subject of wide and indignant discussion in the plant by Monday and had been reported to Scarlett not only by every victim, but by each of the victims' concerned co-workers. Moreover, by Monday, Supervisor Scarlett herself had been subjected to considerable sexual harassment by Jamison, including two outright threats of rape and a Sunday evening foot-in-door home visit.

On both Monday, September 20, and Tuesday, September 21, Supervisor Scarlett went to Plant Manager Lane, told him of Jamison's conduct and the consequent upheaval and concerns which had been raised among the women, and described her own concern as being "not for myself, but for the girls." Lane refused to consider the subject on both occasions, telling Scarlett that Jamison was a "womanchaser," and "only human." After the Tuesday meeting, Scarlett reported to her staff that they would have to talk with Lane themselves, as he did not appear to believe anything she had said.

On Wednesday morning, September 22, all twenty of Scarlett's supervisees (and persons from other departments as well) were gathered around her desk, drinking coffee as usual, prior to the 7:00 a. m. starting bell. On this occasion, however, the subject of discussion was Jamison, and their indignation at being subjected to his intrusions. The young woman whom Jamison had laid off pending a better relationship had returned to ask for her check, and to discuss her status. By seven o'clock, a groundswell of determination had developed (initiated by Ms. Hensley), that the employees would not start work until Lane had listened to their protest against the working condition of Jamison's sexual harassment.

The seven o'clock bell then rang, Jamison came upstairs and demanded to know why no work had started, and Scarlett told him that the women were refusing to work until they could discuss his sexual harassment with Lane. He demanded to know *which* women, whereupon she recited the list, each victim shouted her confirmation, and he

denied one: the only black woman in the group. Finally, Scarlett named herself, struck Jamison, and was promptly hustled by several of her supervisees to the machine shop at the rear of the building, to regain her composure. Jamison ran down the stairs and soon thereafter departed the premises—and the city—without waiting for a paycheck.

Mr. Lane arrived at the building and heard a commotion on the second floor. He went up to the Greenbrier operation and found all of Scarlett's supervisees still grouped at the desk, although Scarlett and Jamison had made their respective exits. He asked why no work had started, and each of the complainants attempted to describe her experience with Jamison. After rebuffing the initial complainants by replying that they were "no baby," or "a big girl," he asked everyone who did not want to work for Jamison to raise their hands. Eight did so. He then told them to work for Jamison or "hit the clock." As they were leaving, in some confusion, Supervisor Scarlett and the two women who had accompanied her to the machine shop emerged therefrom. Lane fired them each on sight without explanation, and herded them down the stairs and off the premises with the others.

When the hand-raising had occurred, eight of Scarlett's supervisees had returned to their sewing machines and started work. One of those testified that she had to do so because she had eight children. The machine operators working on another Greenbrier contract, for military ballistics vests, had been present throughout these events on the same workfloor.

The group of eleven Greenbrier dischargees returned to the plant to request their jobs or their discharge slips that afternoon and twice the next day, before the Downslope payroll clerk prepared their termination notices and distributed them.

It is clear on the facts that the Respondents do constitute a single employer, within the meaning of the Act, as was found by the Board. *Radio and Television Broadcast Technicians Local Union No. 1264 v. Broad-*

**1118**

cast Service of Mobile, Inc., 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965); NLRB v. Winn-Dixie Stores, Inc., 341 F.2d 750 (6th Cir., 1965), cert. den. 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965). It is also clear, on the well-supported facts, that Respondents' discharge of the non-supervisory employees violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), as was found by the Board. Those employees are guaranteed the right "to engage in . . . concerted activities for the purpose of . . . mutual aid or protection" by § 7 of the Act (29 U.S.C. § 157); and employers are forbidden by § 8(a)(1) "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7."

■ Respondents claim that the employees were protesting the hiring of Jamison over Scarlett at the time of the discharge and that the accusations of sexual harassment were a pretext to disguise their personal grudge, which is unprotected Section 7 activity. We note first that the ALJ discredited management witnesses who claimed the allegations of sexual harassment were concocted and we uphold those findings of credibility. Second, freedom from sexual harassment is a working condition which employees may organize to protect under Section 7. As stated in NLRB v. Leslie Metal Arts, 509 F.2d 811, 814 (6th Cir. 1975):

> . . . employees were entitled to be protected against threats of physical violence and other acts of harassment of a fellow employee creating a difficult condition of employment. Under such circumstances they could legitimately protest by concerted activity the failure of the employer to take appropriate action to correct or alleviate the situation.

■ Even if their activity were protected, Respondents argue that the employees voluntarily quit and were not discharged by Lane. The ALJ held that "hit the clock" was an "effective euphemism" for termination of employment. We agree that "work for Jamison or hit the clock" is tantamount to dismissal. The test of whether an employee was discharged depends upon the reasonable inferences that the employees could draw from the language used by the employer. NLRB v. Ridgeway Trucking Co., 622 F.2d 1222, 1224 (5th Cir. 1980); NLRB v. McCaffrey, 619 F.2d 621 (6th Cir. 1980). Taking all of the circumstances into account, it is clear that the employees reasonably inferred that Lane had no intention of addressing their complaints and was firing them.

■ Respondent further argues that even assuming a violation, several employees were erroneously reinstated in the Board order. Michael Steadman was with Supervisor Scarlett when Lane discharged the other employees. Lane's message was immediately conveyed to Steadman and he considered himself discharged. In a mass discharge the motive of the employer, not the individual actions of the employee, is the focus of the inquiry. NLRB v. Waco Insulation, Inc., 567 F.2d 596, 600 (4th Cir. 1977). The abruptness of Lane's discharge and its timing indicate his motive to squelch protected activity. NLRB v. Elias Brothers Big Boy, Inc., 325 F.2d 360 (6th Cir. 1963). The circumstances reveal that Steadman, a participant in the confrontation with Jamison, reasonably inferred that the mass discharge included him. Lane's motive was to squelch protected activity and his unlawful net spread to include Steadman. Thelma Hoskins was not present at the hearing but the evidence was uncontradicted that she participated in the protest and was fired. Her reinstatement was also proper.

■ Respondent objects to the reinstatement of Patricia Murr and Betty Hasty on the grounds that both were offered reinstatement. An illegally discharged employee who has been unconditionally offered reinstatement, accepts it, and then quits voluntarily, loses his or her rights of reinstatement. NLRB v. Waco Insulation, Inc., supra. The evidence is conflicting on the record as to whether Betty Hasty received such an offer. The ALJ, however, credited Hasty's version and we uphold that finding. Her reinstatement was proper. Ms. Murr, on the other hand, admitted on the stand that she returned to work for Greenbrier

within a month of her discharge. Her reinstatement, then, cannot stand and we deny enforcement as to that part of the Board order.

■ Respondents contend that Pamela Richmond was fired two days before the mass discharge. She returned for her paycheck the day of the confrontation and was one of the female employees to "speak up" when Jamison asked who had been harassed. Whether or not her discharge was simultaneous with the others, the motive behind Richmond's discharge was the same. Richmond had rebuffed Jamison's advances on September 19 and was told the next day that she was laid off "until the situation between us is straight." She received her termination on the same day the other discharged employees received theirs. We agree with the Board's finding that Richmond was temporarily laid off September 20, and terminated, along with the other employees, on September 22. Her reinstatement was proper.

The more serious and closer questions presented here are whether the discharge of Supervisor Scarlett was also a violation of the Act and whether her reinstatement, which has been ordered by the Board, can be supported in the law. We answer both in the affirmative.

■ Supervisors are specifically excluded from the definition of employee in the National Labor Relations Act and are thus beyond the scope of that Act's protection. 29 U.S.C. § 152(3). Therefore, a supervisor who participates in pro-union activity may be fired for such activity. A well-recognized exception has developed to allow reinstatement when the supervisor's discharge is part of an integral pattern of employer conduct aimed at squelching protected employee activity. *NLRB v. Southland Paint Co.*, 394 F.2d 717 (5th Cir. 1968). The courts must balance the statutory policy of employer rights to demand loyalty from their supervisors with the policy of employee rights to be shielded from unlawful employer acts funnelled through a supervisor. In the latter situation, the supervisor may be reinstated if that is necessary to dissipate the coercive effects of the employer's acts. *Pioneer Drilling Co. v. NLRB*, 391 F.2d 961 (10th Cir. 1968).

■ Respondents cite *NLRB v. Nevis Industries, Inc.*, 647 F.2d 905 (9th Cir. 1981), for support of their argument that reinstatement of Scarlett would contravene the intent of Congress to allow employers to fire supervisors who engage in pro-union conduct. *Nevis* states that courts have found a violation of § 8(a)(1) and ordered reinstatement of a supervisor only when the supervisor was: (a) disciplined for refusing to commit an unfair labor practice, (b) disciplined for testifying before the Board, or (c) a crew chief, discharged as a pretext for termination of a pro-union crew. These three situations have a heavy impact on employee rights and the broad remedial powers of the Board under § 10(c) of the Act will be invoked to dissipate that impact by reinstating the supervisors. It is unnecessary for us to decide whether the reinstatement power is limited to these three cases because Scarlett may be reinstated under the third exception—a crew chief used as a conduit to discharge her crew.

*Pioneer Drilling Co. v. NLRB, supra,* gave rise to the "crew chief" exception. The court in that case enforced a Board order reinstating a driller and his crew, despite the fact that the driller was a supervisor. The doctrine that drillers may be fired outright for pro-union activity was held to have

> ... no application here for the reason that the Board found that Pioneer's acts were not motivated by the pro-union activity of the supervisors but by that of the employees and thus the supervisors became not the object but rather a conduit of the employer's unlawful acts.

391 F.2d at 963. The employer of *Pioneer* could easily use his supervisors as conduits because the crews and their chiefs were integral units. A crew chief selected his own crew and when he was discharged, the crew was terminated. Justice dictates that when:

... the supervisors-drillers were terminated as a pretext for termination of their union-interested crews and the squelching of the union activity, then the resultant termination of the crews constitutes a violation of their collective bargaining rights under the Act.

391 F.2d at 963. Supervisor Scarlett was promoted specifically to supervise the chemical warfare suit contract. She selected her own crew and hired several friends and relatives. She was a victim herself of sexual harassment and reported several incidents of sexual harassment of employees to her employer. She told her employer that she could take care of herself, but that she was worried about "her" girls. This ample evidence supports the conclusion that the employer's motive in the mass discharge was to use Scarlett as a "conduit" to squelch protected Section 7 activity. Scarlett chose her crew, was close to its members, and was viewed as a protective figure. The crew and Scarlett were an integral unit. The only way to dissipate the coercive effect of the mass discharge is to reinstate the crew *and its supervisor.* Nor can we accept Respondent's argument that Scarlett was fired *after* the other employees and thus could not have been used as a conduit. The employees had been told that management had refused to listen to complaints of sexual harassment and had participated in the confrontation with Jamison culminating in violence, prior to their discharge. By the time Scarlett punched Jamison, the writing was on the wall for her termination, and the technicalities of Lane's timing do not change the result. For purposes of invoking the Board's remedial powers, the incidents of the morning of September 22 are a single confrontation. The coercive effects of the violation of the employee's Section 7 rights that morning can only be dissipated by reinstating Supervisor Scarlett.[1]

Accordingly, the Board order will be enforced in full with the sole exception of that part ordering the reinstatement of Patricia Murr.

LIVELY, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority that the Board's order should be enforced insofar as it directs reinstatement with back pay of rank and file employees who were unlawfully discharged. However, I dissent from the decision to enforce the Board's order insofar as it directs reinstatement with back pay of supervisor Scarlett. It is clear that Congress chose not to extend the protection of Section 7 of the Act to supervisors. Yet in this case the Board found the discharge of Scarlett to be unlawful as "an integral part of Respondent's overall plan to discourage employees from engaging in protected activity." This rationale is not supported by the language or purpose of the Act or by case law.

Member Murphy dissented in part from the decision of the Board in this case, stating:

By the decision in this case, I fear that this Board has once again taken a long and impermissible step toward expanding the National Labor Relations Act to confer upon itself jurisdiction over supervisors which the Act precludes. In finding

---

1. The dissent questions our use of the terms "crew chief" and "conduit" on the grounds that the Board did not employ those terms in their decision and that the Administrative Law Judge made specific findings of a chronology of events which would preclude invocation of the conduit exception. The Board, however, relied on *Pioneer Drilling* in its argument that Scarlett's discharge was the means through which the employer "sought to strike ... at its employees for their turning to protected activities or to discourage their engaging in such activities." (Joint Appendix, p. 803). Further, the Board did not dispute the ALJ's findings of fact regarding a chronological sequence of events because it found "irrelevant to the events here under examination, where only a few minutes separated Lane's statements, and no intervening events of any significance occurred." (Joint Appendix, p. 804, n.7).

The Board's "integral pattern of conduct" test appears to include the "conduit" theory, the heart of which is that there are some employee units where the employer can "take advantage" of the relationship between supervisor and employee to trample employee rights through the supervisor. *Pioneer, supra,* at 963.

that Supervisor Scarlett's discharge violated the Act, the majority is taking the untenable position that anytime a supervisor is fired in close proximity with employees who are found to have been unlawfully discharged under the Act the supervisor's discharge is also protected. In so doing, they are improvidently extending the protection Section 7 offers to employees to cover the concerted and union activities of supervisors. Whether this result is desirable or not, I believe it to be a proscribed one which takes congressional action, not decisional fiat, to achieve.

(Footnotes omitted).

My view of the present case coincides with that of the Fifth Circuit in *N. L. R. B. v. Southern Plasma Corp.*, 626 F.2d 1287 (5th Cir. 1980), where Judge Henderson wrote for the court:

The ALJ also ordered reinstatement and backpay for supervisors Baker and Parker because their termination was "an integral part of a pattern of conduct aimed at penalizing employees" for their organizational activity. We regard this conclusion as a disturbing and unwarranted erosion of the Congressional mandate to exclude supervisors from the Act's protection.

Through §§ 2(3), 2(11) and 14(a) of the Act, 29 U.S.C.A. §§ 152(3), 152(11), 164(a), Congress excluded supervisors from the protection afforded rank-and-file employees who engage in concerted activity for their mutual benefit. Its purpose was to assure management of the undivided loyalty of its supervisory personnel by making sure that no employer would have to retain as its agent one who is obligated to the union. *Florida Power & Light Co. v. IBEW*, 417 U.S. 790, 808–809, 94 S.Ct. 2737, 2746–2747, 41 L.Ed.2d 477, 490–91 (1974). Supervisors fired for engaging in the same activity have no remedy under the Act. *Id.*, 417 U.S. at 811, 94 S.Ct. at 2748, 41 L.Ed.2d at 492. *See also Beasley v. Food Fair of North Carolina*, 416 U.S. 653, 660, 94 S.Ct. 2023, 2027, 40 L.Ed.2d 443, 450 (1974).

However, as explained in *Russell Stover Candies, Inc. v. NLRB*, 551 F.2d 204, 206 (8th Cir. 1977):

[I]f the discharge of the supervisor violates section 8(a)(1) of the Act, that supervisor may be entitled to reinstatement. The supervisor is not protected in his own right—his basis for relief is that his discharge had a tendency to interfere with, restrain or coerce the protected employees in the exercise of their Section 7 rights.

Courts have used reinstatement of a discharged supervisor as a remedy sparingly and in only narrowly defined circumstances. Reinstatement has been approved as a remedy where the supervisor was discharged for refusing to aid his employer in committing an unfair labor practice, *NLRB v. Talladega Cotton Factory*, 213 F.2d 209 (5th Cir. 1954); *Russell Stover Candies*, 551 F.2d 204 [8th Cir.]; where the supervisor was fired for giving testimony before the Board, *NLRB v. Southland Paint Co.*, 394 F.2d 717 (5th Cir. 1968); *Oil City Brass Works v. NLRB*, 357 F.2d 466 (5th Cir. 1966); or where the discharge of a supervisor who hired his own crew was a pretext for the termination of his pro-union crew, *Pioneer Drilling Co. v. NLRB*, 391 F.2d 961 (10th Cir. 1968).

626 F.2d at 1294–95.

I would reject outright the Board's "integral part of a pattern of conduct aimed at penalizing employees for their union activities" test as inappropriate under the Act. There was no discussion of this test in *N. L. R. B. v. Donelson Packing Co.*, 569 F.2d 430 (6th Cir. 1978), cited by the Board. Enforcement was granted on the determination that the findings of fact made by the Board were supported by substantial evidence on the record as a whole. This test is inexact and capable of being used to extend coverage to persons not intended to be covered by Congress.

The cases from this court in which the reinstatement of supervisors has been enforced typically have involved discharges for failure of the supervisor to commit un-

fair labor practices at the employer's behest, *Elder-Beerman Stores Corp. v. N. L. R. B.*, 415 F.2d 1375 (6th Cir. 1969), *cert. denied*, 397 U.S. 1009, 90 S.Ct. 1237, 25 L.Ed.2d 421 (1970); *N. L. R. B. v. Lowe*, 406 F.2d 1033 (6th Cir. 1969); or for giving testimony adverse to the employer at a Board hearing, *N. L. R. B. v. Carter Lumber, Inc.*, 507 F.2d 1262 (6th Cir. 1974). In the present case the Board ordered reinstatement of a supervisor who had a personal complaint against management and was discharged for joining a protest by statutory employees with similar complaints. Reinstatement of a supervisor who has been discharged for joining in the same concerted activities undertaken by rank and file employees for their mutual benefit is not permissible.

The majority relies on what it terms the "crew chief" exception, citing *Pioneer Drilling Co. v. N. L. R. B.*, 391 F.2d 961 (10th Cir. 1968). The term "crew chief" is not used in *Pioneer Drilling*. What the court said about reinstating supervisors in that case was that the pro-union activity of the employees motivated the employer to discharge the supervisors, and thus "the supervisors became not the object but rather a conduit of the employer's unlawful acts." *Id.* at 963. The Board did not argue that this was a "conduit" case. The administrative law judge who heard this case found as a fact that "the chronological sequence here leads to the conclusion that the Respondent did not interfere with its employees' Section 7 rights by discharging Scarlett ... There is no indication that Lane was seeking to 'cover up' employee discharges by terminating Scarlett. He simply discharged everyone who engaged in the protest, including her." (App. at p. 789).[1] *Scarlett*, along with the rank and file employees, was discharged for protesting. She was not a "conduit of the employer's unlawful acts"; she was individually an object of the employer's wrath and suffered the same fate as the employees. *Pioneering Drilling* is not applicable.

Though the conduct of Jamison toward Scarlett was outrageous and indefensible, I do not believe her discharge comes within any of the "narrowly defined circumstances" where reinstatement of a supervisor is authorized. *N. L. R. B. v. Southern Plasma Corp., supra*, 626 F.2d at 1295. I would deny enforcement to that portion of the order which requires the respondent to reinstate Scarlett with back pay.

---

1. The Board did not disagree with this finding. It applied an impermissible legal test to the facts—that Scarlett's firing was "an integral part" of an overall plan to discourage protected activity.