JUSTICE SHEEHY,
dissenting:
Nothing is more clearly established in Montana law, that when a trial is by jury, all questions of fact are to be decided by the jury, and all evidence thereon is addressed to them, § 25-7-103, MCA; § 26-1-202, MCA; and that the jury is the judge of the effect and value of evidence addressed to it, § 26-1-203, MCA. Our State Constitution declares the right of trial by jury is secured to all and shall remain inviolate, Art. II Sec. 26, 1972, Montana Constitution. Rule 38(a) Montana Rules of Civil Procedure is a declaration that the right of trial by jury shall be preserved to parties inviolate, in the application of the rules.
In reversing this hard-earned verdict, obtained by a faithful employee against the defendant company from a properly constituted jury, no error can be found by the majority, such as an incorrect instruction of law or an improper ruling of law made by the District *31 Court. Rather, the majority assume seats in the now vacated jury box, and proceed to reverse the earlier jury on the facts.
The reversal is hinged on the majority’s conclusion of fact which directly opposes the jury’s conclusions:
“A key factual conclusion is that Mr. Finstad chose not to accept the transfer from Cut Bank to Butte. That is not in dispute. Notwithstanding his refusal to accept the transfer, Mr. Finstad contends he was actually discharged.” (opinion at 1381.)
Whether Mr. Finstad refused to go to Butte was very much in dispute. The jury in this case decided that Mr. Finstad did not refuse a transfer from Cut Bank to Butte. On disputed testimony, the jury found that the actions of Carl Anderson on June 2, 1982 constituted an actual discharge. At the least it constituted constructive discharge.
The test of whether an employee quit or was discharged is whether the employer’s statements or actions at the time would reasonably lead the employee to believe that he had been terminated and that a formal discharge notice is unnecessary. 48 Am.Jur.2d 750, Labor, § 922.
The test of whether an employee is constructively discharged depends upon reasonable inferences that the employee could draw from the language used. NLRB v. Downslope Industries, Inc., (1982, CA 6), 676 F.2d 1114.
Whether Mr. Finstad quit or was terminated was a matter of hot dispute during the trial. The jury chose to believe Mr. Finstad. He testified as to the meeting of June 2, 1982 as follows:
“Q Did you have any discussion with Carl Anderson concerning your productivity while you were driving from Butte to Cut Bank?
“A I told Carl I couldn’t accomplish much while I was behind the wheel of a car.
“Q And, is that a fact?
“A That’s a fact.
“Q Do you recall Mr. Fleming telling this jury that you would not agree with the decision of the Montana Power Company and chose not to be employed by it anymore?
“A Yes.
“Q Tell this jury when you chose not to be employed by the Power Company?
“A I never did choose not to be with Montana Power.
“Q You heard Mr. Fleming state that no one came into the office and said, You’re fired.
*32 “A Yes.
“Q What did happen?
“A Carl came in that morning about 9:00 and sat down and told me that I would be moving to Butte. Once again, he told me that I would be doing the same things I had been doing in Cut Bank. I tried to point out to him that I just couldn’t keep that pace up. I had recently gotten out of the hospital and I was devoting all of my time, as it was, to Montana Power. And, I just didn’t think it was going to work and we talked for perhaps a half an hour and we neither were making any headway and Carl said, Well, I need to talk to Don Percival. [Percival was Carl Anderson’s superior.]
“Q Did you suggest that he do that?
“A No.
“Q Why did he tell you he needed to talk to Don Percival?
“A I don’t really know.
“Q What were you trying to tell him would happen to the Power Company if they moved you to Butte?
“A I was just simply telling him it wouldn’t be efficient. I didn’t see how I could run that operation out of Butte and drive the miles they expected me to.
“Q In addition to what you were already doing?
“A Right.
“Q Then what happened?
“Q I offered Carl the use of our local microwave telephone which is a direct hook-up to Montana Power’s offices, and he said, No, it’s a private call. And, I said, I could leave the room. And, he said, No, this is a private call.
“Q Did he leave then?
“A Yes.
“Q And, how long was he gone?
“A About 15 minutes.
“Q And, when he came back, what happened?
“A He came through the door and he said, Give me the keys to your company car, and he says, Turn in your credit cards, and he said, You can clean out your personal effects from this office.
“Q What did you say?
“A I said, You mean there aren’t any alternatives to this?
“Q And, what did he say?
“Q And, he said, There are none.
“Q Did you say anything else?
*33 “A I said, you know, Isn’t there any compassion left in this Company?
“Q And, what did he say?
“A He said, Well, you know, when Percy puts the knife in, he likes to twist it.
“Q Then when Carl Anderson came into your office, demanded your credit cards, your key to the office and your car, and told you to clear out of the office, what did that mean to you?
“A Well, that was the end of my career.
“Q Did that mean you were fired?
“A Yes.
“Q Did you resign?
“A No.
“Q Did the thought of resigning ever occur to you?
“A Never.”
The testimony of Carl Anderson, which the jury chose not to believe, is in substantial conflict with Mr. Finstad as to what happened at the meeting of June 2, 1982:
“Q That brings us to on or about June 2, 1982, which this jury has heard an awful lot about. What took place on June 2, 1982 between yourself and Mr. Finstad. If you recall?
“A I had come to Cut Bank the night before and went to the office fairly early, 9:00 or thereabouts and told Ken the time has come and we are making a decision and this is the day we are doing it. We just can’t drag it out any longer. He probably went through the same sort of things, the reasons he didn’t want to come to Butte and my reasons why I wanted him to come, and it finally culminated in Ken and we just couldn’t get to the point, this was it, so I said to Ken, If you are not going to move to Butte, Ken, you may as well give me your car keys and forget about it. Prior to that he said, Well — now, I recall, Well, Carl, I am not going to move to Butte, so let me just clean up the odds n ends we have got going in Cut Bank and I’ll stay here until the end of the month and close the office for you. And, I said, Ken, it isn’t going to be any easier at the end of the month than today. And if you are not going to come to Butte, you might as well give the keys to me.”
There is clearly a conflict in the testimony between the two principal protagonists as to whether Mr. Finstad refused a transfer to Butte. Mr. Finstad said he never refused, while Carl Anderson said he did. The jury resolved that issue of fact. Yet the majority states *34 that Mr. Finstad chose not to accept the transfer from Butte and “that is not in dispute.” It was the principal dispute of the trial.
The jury also relied on further evidence that Mr. Finstad was in fact willing to transfer from Butte, because he called a superior, Jay Johnson on the same day who told Finstad he would try to get him a job; he called Bob Rhodes and Bill Roberts, who are also supervisors, whom Mr. Finstad asked if they could give him any kind of help in getting his job back. Mr. Finstad further testified:
“Q Did you tell any of these people after June 2, 1982, when you were trying to get a job with the Power Company, any of them, Jay Johnson, Robert Rhodes, Bill Roberts, Carl Anderson, Joel McElwain, any of them, that you would not move to Butte?
“A No.
“Q Did you in any way limit the location of your residence if you were permitted to return to work for the Power Company?
“A No I didn’t.”
Finstad also testified that he was willing to reside wherever the Power Company would have asked him to reside without any exceptions.
In other testimony, Percival and Anderson testified that they never discussed with Mr. Finstad the extra travel he would have to undertake to perform his job in Northern Montana if he transferred to Butte; that one of the reasons he would not transfer was because of the health of his wife. Mr. Finstad refuted this testimony through his own evidence about the amount of travel, and the fact that the Power Company would continue to drill extensively in Northern Montana; that the supervision of an engineer was necessary for that continued drilling; and he produced his wife and their son each of whom testified that there was no objection on the part of the family to move into Butte for any reason. In fact Don Percival, the ultimate decision-maker, testified that Mr. Finstad never at any time told him that he would not move to Butte.
There are approximately 700 pages of testimony in this case not counting portions of transcript devoted to the settlement instructions and other matters. The majority have selectively used portions of the testimony to assert that there was no issue in this case of actual discharge or constructive discharge and the majority apparently contend that the jury had no substantial basis upon which to render its verdict. The record is clear that there was indeed substantial evidence supporting the jury verdict and it should be maintained.
*35 The further portion of the majority opinion respecting a breach of the implied covenant in cases involving lateral transfers or proposed lateral transfers is a gratuitous action by this Court not necessary to the decision and is therefore mere dicta. It would however be dangerous dicta if in the future it would be applied as a means for an employer to avoid liability for constructive discharge by a pretended lateral transfer.
I would sustain the jury verdict.
JUSTICE HUNT joins in the dissent of JUSTICE JOHN C. SHEEHY.
ORDER
The petition for rehearing is denied.
DATED this 22nd day of February, 1990.
s/J.A. Turnage, Chief Justice
s/John Conway Harrison, Justice
s/Fred J. Weber, Justice
s/Diane G. Barz, Justice
s/R.C. McDonough, Justice