**NORTH AMERICAN DISMANTLING CORP., North American Demolition Corp., Petitioners–Cross Respondents,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

No. 00–2116, 00–2330.

United States Court of Appeals, Sixth Circuit.

April 12, 2002.

Before KENNEDY, BOGGS, and DAUGHTREY, Circuit Judges.

KENNEDY, Circuit Judge.

North American Dismantling Corp. and North American Demolition Corp. (the "Companies"), appeal from an order of the National Labor Relations Board (NLRB) affirming the judgment of an Administrative Law Judge (ALJ) that they violated section 8(a)(1) of the National Labor Relations Act, which makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of their rights" to engage in concerted activities. The case concerns three one-time employees of the two Companies, Jeffrey G. Powell, Robert W. Giltrop, and Jayson Zeitz, who left a construction site operated by one of the Companies on the morning of May 9, 1997 after a confrontation with the on-site superintendent. The NLRB found that the three employees were discharged because they engaged in protected concerted activity. The Companies argue that the employees were not engaged in concerted activity and that they were not discharged on the morning of May 9. The Companies acknowledge that employee Powell was subsequently discharged, but claim that discharge was legally justified by Powell's attempt to steal the construction job from the Companies by negotiating directly with the Companies' client.

We review orders of the NLRB under the "substantial evidence" standard. Since the NLRB is charged with enforcing the provisions of the National Labor Relations Act, we defer to its application of the law to the facts unless such an interpretation is not supported by evidence that would be adequate, in a reasonable person's mind, to uphold the decision. *Horsehead Resource Development Company, Inc. v. NLRB*, 154 F.3d 328, 338 (6th Cir.1998). We do not overturn the Board's "credibility determinations ... unless it is clear that there is no rational basis for them." *NLRB v. Valley Plaza, Inc.*, 715 F.2d 237, 242 (6th Cir.1983).

Applying this deferential standard, we enforce the Board's decision as to two of the employees. However, as to Powell (who arguably engaged in additional misconduct), we deny enforcement at this time and remand for further findings.

## I. FACTS

Rick Marcicki established two Companies, North American Dismantling and North American Demolition. Both perform similar work, demolishing residential and commercial buildings in the Michigan and Ohio areas. The two Companies differ in that Demolition has contracts with several locals of the Laborers and Operating Engineers, works on unionized sites, and pays its workers union wages (and provides fringe benefits). Dismantling, in contrast, has no collective bargaining agreements with the unions and pays a lower, non-union wage (and provides no

fringe benefits). Occasionally, Dismantling signs contracts with the unions for specific projects.

The plaintiffs Jeffrey Powell, Robert Giltrop, and Jayson Zeitz were members of the union, albeit of different locals, but worked for both Companies. On May 7 and May 8, they worked on a union job for Demolition under the supervision of Donald Borashko, and on the afternoon of May 8th Borashko told them to report to a site in Lake Angelus, Michigan, the next day, without specifying whether they would be paid union or non-union wages. Jason Malady, another employee, told Powell that the work would be non-union. Upon arriving at work on the 9th, the workers discussed amongst themselves the question of whether they would receive union wages, and concluded that they would not. Borashko made work assignments and left the job site to handle some errands.

While Borashko was off site, Giltrop called the union's Ann Arbor local, but was told that the job site was not under its jurisdiction. Zeitz called the Pontiac local, and was told he should negotiate with the employer for union wages.

While working (prior to Borashko's return), Powell approached Richard Christie, the general contractor, and requested that he make up the difference between the union and non-union wages. Christie declined to do so, saying that he had an agreement with Marcicki. Powell then told Christie that he could do the job, with his own crew, for a lower fee than Marcicki was charging.

When Borashko returned to the site, Powell, Giltrop and Zeitz complained about the wages, App. at 268, and Powell asked Borashko to call Marcicki to relay their request for union-level wages. At some point, Borashko apparently attempted to call Marcicki but could not reach him, although it is unclear whether this occurred at the outset of the employees' confrontation with Borashko or subsequent to it. Borashko testified that Powell said that if "they weren't going to get union wages they were walking", and that Borashko "told them to go." App. at 251. The employees testified that Borashko told them that if they did not like the non-union wage, they should "go home and find another job." App. at 166. The employees left the site.

According to Borashko, after the employees left, Christie told him about Powell's offer to do the job with his own crew "for cash." App. at 271–72. Christie testified that he told Borashko about his conversation with Powell prior to Borashko's confrontation with the workers. App. at 226–27. Marcicki returned to the site later that afternoon, and Borashko, Christie, and Malady explained what had happened.

On May 22, Powell called Marcicki to say that he was ready to work on a non-union job. Marcicki refused to take the call, and had his secretary tell Powell that "he was no longer an employee." App. at 293.

Powell, Giltrop and Zeitz filed unfair labor practice charges under Section 8(a)(1) and 8(a)(3) of the National Labor Relations Act.[1] The ALJ found for the workers on the 8(a)(1) but not the (a)(3)[2] claim, and recommended the NLRB order the Companies to cease and desist from their violation, reinstate the employees,

---

1. Initially, the workers had claimed the company had engaged in an unfair labor practice by transferring them from a union to non-union workplace. That issue is not part of this appeal.

2. Section 8(a)(3) prohibits efforts to discourage membership in a labor organization. The workers do not appeal the NLRB's finding that the Companies did not violate (a)(3).

and provide them with back pay. The NLRB affirmed the ALJ's finding and adopted its recommendation.

## II. ANALYSIS

The Companies argue that the ALJ and the NLRB did not have substantial evidence to conclude that the Companies engaged in an unfair labor practice by taking action against the protected concerted activity of the employees. As to Giltrop and Zeitz, we deny the petition for review and enforce the Board's order. However, as to Powell, the third employee, we find that the Board failed to make sufficient findings that Powell would not have been fired for his alleged misconduct in offering to do the job on his own.

### A. WERE THE EMPLOYEES FIRED?

■ The Companies' first argument on appeal is that the employees were not discharged by Borashko on May 9, but rather engaged in an economic strike or quit their jobs. The Companies assert that Giltrop and Zeitz were never fired, and that Powell was fired by Marcicki on May 9, not for demanding union wages and walking off the job site, but for offering to do the job with his own crew for cash. The ALJ rejected the argument that the employees engaged in an economic strike. Instead, the ALJ found that Borashko's statement to the employees that they return to work for non-union wages or "go home and find another job" was a conditional termination: either the employees accept the lower, non-union wage, or they are terminated. The conditional termination, according to the ALJ, preempted the employees' walkout.

It seems obvious that the employees did engage in an economic strike by refusing to return to work. Borashko's statement gave them the option of returning to work at the non-union wage—therefore, they were clearly not fired for complaining about receiving non-union wages. However, Borashko's statement implied that by not returning to work they would be terminated. Thus, once the workers refused to return to work (and left the job), they were fired.

An employer's action will be considered termination of an employee if the employee could have reasonably interpreted the employer's action to be a termination. *NLRB v. Downslope Indus., Inc.*, 676 F.2d 1114, 1118 (6th Cir.1982); *Hale Mfg. Co.*, 228 NLRB 10, 13 (1977); *Ridgeway Trucking Co.*, 243 NLRB 1048, 1049 (1979).

The employees testified that they interpreted Borashko's statement as terminating their employment if they did not return to work. App. at 172. The Companies argue that the employees did not believe they were fired, and that such a belief would have been unreasonable. First, the Companies challenge the credibility of the workers' testimony regarding Borashko's statement. Contrary to the assertion of the Companies, *see* Br. at 31, Borashko never affirmatively denied making the statement the workers attribute to him, that they should "go home and find another job." He gave a different version of the statement, in which all he said was "go on home." App. 252.

The ALJ credited the workers' version of the statement, and we find that there is a "rational basis" for his credibility determination. The ALJ concentrated on the demeanor of the three workers, noted inconsistencies in Borashko's recollection of the incident, and reasonably credited the employees' version of events.[3] An employ-

---

3. We give special weight to the ALJ's determination of credibility because she "sees the

ee could have reasonably interpreted the direction to "find another job" as a termination. Even if Borashko's version of the conversation was true, the phrase "go home" has been found to provide a reasonable basis for employees believing they are fired in other cases. *Hale Mfg.*, 228 NLRB at 3 & 5. In *Downslope Industries,* we agreed that the phrase "work for Jamison or hit the clock" was "tantamount to a dismissal" and found that "the employees reasonably inferred that Lane had no intention of addressing their complaints and was firing them." 676 F.2d at 1118. *Downslope Industries* is directly on point. Though the NLRB subsequently changed its position in one regard, *see Serendippity–Un–Ltd.,* 263 NLRB 768 (1982), our position on which phrases can reasonably interpreted to terminate employees remains the same.

In addition, the NLRB has frequently held that firms have some affirmative obligation to contact employees who may think they have been fired. *Hale Mfg. Co.,* 228 NLRB 10; *Ridgeway Trucking Co.,* 243 NLRB 1048. That Marcicki did nothing to contact Zeitz and Giltrop adds to the strength of the ALJ's determination that they were fired.

The Companies argue that the employees were not fired; rather, that they went on strike. It is true that the act of walking off or refusing to do work is usually considered a strike, *Quality CATV,* 27 NLRB 1282 (1988). The key to this case is that Borashko's termination conditionally depended on the employees returning to the job they were asked to do. If the employees went on strike, or walked off the job, they were fired. By walking off the job, the employees engaged in an economic strike, but it is undisputed that an employer violates Section 8(a)(1) for dis-

charging a striking employee. *NLRB v. Champ Corp.,* 933 F.2d 688, 694 (9th Cir. 1990). The employer could replace striking employees, but could not terminate them without running afoul of the protections of the NLRA.

Second, the Companies suggest that the employees could not have thought they were fired because they knew that Borashko lacked the authority to fire the Companies' workers. The legal question, of course, is whether or not, based on what they knew about Borashko's role, the employees could have reasonably believed he had the authority to fire them. There is substantial evidence indicating that the employees did not know Borashko lacked such authority. Marcicki testified that in a conversation with Giltrop and Zeitz, who had asked him why Powell got a more desirable assignment than they did on an earlier project, Maricki had told the workers that "Borashko is the superintendent and you have to do what your *boss* tells you." App. at 290 (emphasis added). The ordinary meaning of the word *boss* includes the authority to fire a worker. If the employees thought Borashko was their boss, it would be reasonable for them to believe that Borashko had the authority to fire them. The employees' credited testimony that Borashko asserted his authority as "boss" provides further evidence pointing to the reasonableness of their belief they were fired. The workers testified that when they initially asked Borashko to contact Marcicki, Borashko said he did not have to do that since he, Borashko, was their boss and could answer any question they had. The ALJ credited this finding, and discredited Borashko's testimony that he immediately attempted to contact Marcicki when approached by the workers. App. at 13–14. The ALJ explained that

witnesses and hears them testify, while … the reviewing court look[s] only at the cold

records." *NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 408, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962).

Borashko's testimony was not entirely consistent and that, based on their demeanor, the workers were more reliable witnesses.

The Companies argue that since Zeitz and Giltrop had walked off an earlier job supervised by Borashko, but subsequently returned to work, it would have been unreasonable for them to think that Borashko's statement amounted to a termination. But when Zeitz and Giltrop left the earlier job, Borashko made no statements that they should find another job. The Companies do not demonstrate that the employees had any knowledge of what procedures were required to terminate them. In fact, the record does not indicate that the Companies have any formal procedures. Marcicki did terminate Powell, according to Marcicki's testimony, App. at 301, but he did not contact Powell to tell him so. He did not send a letter, and did not attempt to speak to Powell. It is certainly reasonable for the employees to have thought they were terminated by Borashko given that no one seems to know what the proper termination procedure was.

## B. WERE THE EMPLOYEES FIRED FOR PROTECTED ACTIVITY?

█ The Companies next argue that the workers were not engaged in concerted activity entitled to the protection of the Act. Under *Meyers Industries Inc.*, 281 NLRB 882 (1986), to be able succeed in showing a violation of Section 8(a)(1) an employee must show that she engaged in activity not totally on behalf of herself. The Companies argue that "Powell was taking up his own individual agenda in seeking union scale for himself alone and not for the remainder of the crew." Br. at 29. This argument has no merit. By Marcicki's own admission at a state unemployment hearing regarding Powell, one of the reasons Marcicki terminated Powell was for inciting other employees to walk off the job and refuse to work. App. at 16. In addition, Borashko in several instances during his testimony before the ALJ used words such as "they" to describe the conduct and demands of the three employees, which we think suggests that he perceived their demand for union-scale wages to be a concerted action rather than Powell's alone.

## C. WAS THERE OTHER CAUSE TO FIRE POWELL?

█ Finally, the Companies argue, as to Powell, that his termination was justified by his effort to "steal" the job in his conversation with Christie. The ALJ discredited Powell's denial of this conversation, but concluded based on Borashko's testimony that Christie did not inform Borashko of Powell's offer until after Borashko told Powell to find another job. Because there is no clear error in this finding, we do not overturn it or the Board's conclusion that Powell, like Zeitz and Giltrop, was wrongly terminated by Borashko at the job site.

However, when Powell contacted Marcicki on May 22 (according to the ALJ's factual finding), Marcicki had Powell's conduct of seeking to steal the job as a justification for telling Powell that he did not have a job. In "mixed motive" cases, where an employer fired an employee (1) engaged in protected activity but also (2) engaged in non-protected activity that would provide a basis for termination, the burden initially rests on the NLRB General Counsel to show that the protected activity was a basis for the termination. However, the employer may advance an affirmative defense that the employer would have taken the same adverse action even in the absence of protected conduct on the part of the employee. Such a defense is governed by the standards set forth in *Wright Line, Inc.*, 251 NLRB

1083, 1087 (1980), which the Supreme Court endorsed in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 402–402, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).

Here, the Companies asserted that Powell would have been fired for attempting to steal company business even had he not engaged in protected concerted activity. The NLRB failed to make any finding as to the Companies' affirmative defense on this point. The ALJ found that the Companies actually fired Powell (at the job site) for his protected concerted activity, rather than his attempt to "steal the job." By the time Powell called Marcicki, however, his misconduct could have been the basis for the Companies' refusal to re-hire him. If the Companies prevail in a *Wright Line* analysis on this basis, Powell is only entitled to back wages for the period between being fired at the job site and requesting employment in his call to Marcicki's office.

Therefore, we do not enforce the Board's decision as to Powell and remand for a consideration of whether he would have been terminated May 9, 1997 on the basis of his conduct even in the absence of protected activity. We enforce the Board's order as to Zeitz and Giltrop.